EDWARD H. McALLISTER v. THE DETROIT FREE PRESS COMPANY.

*Libel and slander—Privilege—Rights and liability of the press.*

1. In this case it is *held* that the item published by the defendant was confessedly untrue in several particulars, which *false* items all tended, in the connection used, to carry the impression that the plaintiff and his companion were guilty of felony, and that the case should have been submitted to the jury.

2. The following propositions are summarized from the opinion of Mr. Justice MORSE:

*a*—The greater the circulation of a newspaper, the greater the wrong done by an unwarranted publication, and the more reason why greater care should be exercised in the publication of *personal* items.

*b*—No newspaper has any right to trifle with the reputation of any citizen, or by carelessness or recklessness to injure his good name and fame or business; nor has its reporter any more right to collect the stories on the street, or even to gather information from policemen or magistrates *out of court*, about a citizen, and to his detriment, and publish *such* stories and information as *facts*, than has a person not connected with a newspaper to whisper from ear to ear the gossip and scandal of the street. If *true,* such publication or such speaking may be privileged, but if *false*, the newspaper as well as the citizen must be responsible to any one who is wronged and damaged thereby.

*c*—It is indignity enough for an honest man to be arrested and put in prison for an offense of which he is innocent, and for which indignity ofttimes he has no redress, without being further subjected to the wrong and outrage of a *false* publication of the circumstance of such arrest and imprisonment, looking towards his guilt, without remedy. No sophistry of reasoning, and no excuse of the demand of the public for news, or the peculiarity and magnitude of newspaper work, can avail to alter the law, except, perhaps, by positive statute, which is doubtful, so as to leave a party thus injured without any recompense for a wrong which can even now, as the law stands, never be adequately compensated to one who loves his reputation better than money.

*d*—The *truth* is privileged when published from good motives, and for justifiable ends. And that which is *not* true, but *honestly* believed to be true, and published in *good faith*, by one in the performance of a public or official duty, in certain cases, is also privileged. This is so in the case of communications made to a body or officer having power to redress a grievance complained of, or cognizance of the subject-matter of the communication, to some intent or purpose; and in cases where the communication is made confidentially, or upon request, where the party requiring the information has an interest in knowing the character of the person inquired after. So may a person be justified where he is *honestly* endeavoring to vindicate his own interests, as in the case of the slander of title, or guarding against any transaction which might operate to his own injury.

*e*—The liberty of the press, as the law now stands, is only a more extensive and improved use of the liberty of speech which prevailed before printing became general; and, independently of certain statutory provisions, the law recognizes no distinction in principle between a publication by the proprietor of a newspaper and by any other person. A newspaper proprietor is not privileged, *as such*, in the dissemination of the news, but is liable for what he publishes in the same manner as any other individual.

Error to Wayne. (Reilly, J.) Argued June 5, 1889. Decided October 11, 1889.

Libel case. Plaintiff brings error. Reversed. The facts are stated in the opinion.

*Corliss, Andrus & Leete* (*Edwin F. Conely*, of counsel), for appellant.

*F. A. Baker*, for defendant.[1]

MORSE, J. On Saturday, February 11, 1888, the plaintiff and one Lester B. French, two reputable citizens of Detroit, crossed over to Windsor. French went to Windsor to dis-

---

[1] Counsel for defendant contended that—
1. The arrest of the plaintiff was legal.
2. The alleged libelous article was a privileged publication.
3. There was no evidence to show any abuse of the privilege. No authorities were cited.

pose of about $27 of Canadian postage stamps which he had purchased of Dr. Kennedy, of Detroit. McAllister went with French because the latter asked him to, and did not know what was the object of French's visit.

After they arrived at Windsor, they met a Mr. Ronald, who resided there, and walked up to the Manning House, which was soon to be opened, for the purpose of looking through it, having been invited to do so by Mr. Ronald. When they got there the house was locked, and Mr. Ronald had no key to it. From there they went to the post-office. French went to the stamp window, and asked the gentleman there, who proved to be the assistant postmaster, if he would take some stamps "that had been sent to us on the other side;" told him that he got the stamps from a physician on this (American) side. The man said (so French testifies, and it is not disputed): "No, we cannot take them here;" and directed him to a book or stationery store a few doors below. McAllister stayed in the post-office until French was through, but did not know what the latter was doing.

From the post-office they went to the book-store. French explained at this store how he came to have the stamps, and offered them for sale. The man at the store said he had so many on hand he could not use them, and directed French to another book-store. They then went to the second book-store, where French sold about $10 worth of stamps, at a discount of from three to five per cent. Before going to this store they stopped at another place, where French offered stamps for sale, but sold none. McAllister knew what French was doing after they left the post-office. French might have sold all his stamps at the book-store at 10 per cent. discount, but declined to do so.

As they came out of this store, they were arrested and taken to jail by a policeman, accompanied by the assistant post-master. McAllister wanted to know what the trouble was,—

what they were arrested for—but received no answer. French said:

"If there is anything wrong, if you will take us to the telephone we will identify ourselves. Here is the man that owns this hotel here. I can telephone to him; he is on the other side of the river, and will come over. I am well acquainted with business men over there, and we will satisfy you that everything is all right."

The officer answered:

"That don't make any difference. Go with us, and we will take you to a telephone all right."

They were not taken to a telephone, but to the jail, where they were searched, and everything taken from them. They told the officers that they lived in Detroit, and who they were. The effects upon them—letters, the monogram upon McAllister's watch, and a bank book in the possession of McAllister—corroborated their story, but it was of no avail. The chief of police, Bains, came to them at the station, dressed in citizen's clothes, and asked French where he got the postage stamps. French asked him, "Who are you?" to which Bains replied, "None of your business." French then said, "Then it's none of your business where I got them." Thereupon Bains fell into a passion, and locked them up in different cells.

After they were locked up, Bains asked them who they were, and if they knew any one in Detroit. McAllister told him where he lived; that he boarded at the Antisdel House, but had been away from there. He wished to send for Mr. Andrus, his attorney, but this was denied him. Bains asked, "Do you know any detective in Detroit?" They could not think of any, and then Bains said, "If you don't know any detective in Detroit, you don't live there," and went away. They were put in jail about half past 12, and remained there until about 7 P. M. About 3 P. M., detectives McDonell and Noble came over from Detroit, and were asked if they knew

them, and McDonell said he knew McAllister well, and related that when McAllister's house was robbed he looked up the case for him. He also said that he had seen Mr. French, but could not place him, but knew his face well. McAllister said to Bains:

" You have found. nothing at all suspicious on me. Can't you let us sit in the office, instead of putting us in the cell again?"

But Bains said:

" No; you go right back in there."

He refused to let them occupy the same cell. French told Bains that he got the stamps of Dr. Kennedy.

Bains came in at one time with a piece of paper in his hand, and said:

" French, you are a liar. I have telegraphed to Dr. Kennedy, and he says he don't know you."

Bains let French go to the telephone at one time, but for some reason he could not get Detroit; and Bains said:

" Come away from there. I guess you don't want to get them very bad, anyway."

It seems that Mr. Wigle, the postmaster, made a complaint before Alexander Bartlett, the police magistrate at Windsor, against French and McAllister, for the unlawful sale of postage stamps, under a Canadian statute reading as follows:

" No person other than a postmaster shall exercise the business of selling postage stamps or stamped envelopes to the public, unless duly licensed to do so by the postmaster general, and under such conditions as he prescribes; and every person who violates this provision by selling postage stamps or stamped envelopes to the public, without a license from the postmaster general, shall, on summary conviction, incur a penalty not exceeding $40 for each offense." 38 Vic. chapter 7, § 74, being Rev. Stat. Can. chapter 35, § 106.

Neither French nor McAllister had any knowledge of this

statute, or that they were doing anything wrong in selling or offering these stamps for sale.

The complaint was read to French and McAllister, who were taken before the magistrate for that purpose; but the magistrate swears that Mr. Wigle was convinced by the time the complaint was read that they were innocent of any intentional violation of the law, and withdrew it. No complaint was made against them for any other offense. There was some talk between Mr. Wigle and the magistrate about the robbery of a post-office at Bothwell, Ontario. The magistrate could not swear that the chief of police informed him that he suspected these men of that robbery, but thinks it quite probable that he did. There was, the magistrate says, no hearing or adjournment on the complaint made by Wigle. Wigle withdrew it, and that was the end of it, as far as the magistrate was concerned. It was withdrawn between 3 and 4 o'clock P. M.

But Mr. Bains, as they testify, kept these men incarcerated until after 6 o'clock P. M., and told them then that he was not quite satisfied, but they could go if they would come back at 9 A. M. on Monday. On Monday they went over, and were told they were not wanted. Bains swears that he did not require them to return on Monday, but released them unconditionally. While in Canada, French and McAllister received no intimation from any one that they were suspected of the Bothwell robbery, and knew nothing about it.

The Detroit Free Press (daily) on Sunday, February 12, 1888, contained a number of items of news under the heading of "Windsor." In these items, and the third one in the list, appeared the following:

"A week ago, it will be remembered that a safe was cracked in Bothwell, and that $2,000 in money and about $30 worth of stamps were stolen. Yesterday two hard-looking citizens canvassed the entire business part of Windsor, in the effort to sell stamps at half price. They at last tried to sell the stamps to Postmaster Wigle, who had them arrested.

They were searched at the station, and upon one of them was found $30 worth of stamps. They gave their names as Edward H. McAllister and Lester B. French. Chief Bains will hold them to await developments."

On Tuesday, the fourteenth of February, 1888, under the heading of "Windsor," the Daily Free Press published, with other items of news, the following:

"Edward H. McAllister and Lester B. French, the men who were arrested on Saturday for trying to dispose of stamps at half price, have been released, as there was no evidence to show that they are the men who are wanted at Bothwell."

It is not shown that the Free Press ever made any other or further allusion to the matter. The plaintiff brought suit against the Free Press Company for libel, declaring upon the first publication.

The defendant pleaded the general issue, and gave notice that on the fourth day of February, 1888, the post-office building at Bothwell, Ontario, was feloniously broken into and entered by a person or persons unknown, who did then and there steal Canadian postage stamps of the value of $30, and also money, jewelry, goods, and other personal property of the value of $200; and that on the eleventh day of February, 1888, the plaintiff went to Windsor, with a companion, and offered for sale a quantity of Canadian postage stamps, of the value of about $30, and that among other persons to whom he offered them was the assistant postmaster at Windsor; that said assistant postmaster reported the facts of said burglary and larceny at Bothwell, and the attempt of said plaintiff and his companion to sell about the same quantity of postage stamps, to a police officer at Windsor; that upon such information said police officer had reasonable cause to suspect the said plaintiff and his companion to have been guilty of the felony aforesaid; and that thereupon the said police officer, by virtue of his power as such officer, arrested

the said plaintiff and his companion, and took them before Alexander Bartlett, a police magistrate in Windsor, to be dealt with according to law.

"And the said defendant will further insist and prove that, if it published the alleged libelous article set forth in the plaintiff's declaration, the same was a true and correct account of the said felony, and of the arrest of the said plaintiff and his companion by a police officer, on his suspicion that they were guilty of said felony; and said article was and is in that sense a true and correct statement of the facts, and was published as a privileged publication, and for good purposes and justifiable ends."

Upon a trial had in the circuit court for the county of Wayne, before a jury, Hon. C. J. Reilly, the presiding judge, directed a verdict for the defendant, and judgment passed accordingly.

It is to be presumed that the trial judge held the publication to have been privileged; no reason being stated in the record for his action.

In addition to the facts of the arrest as hereinbefore stated, the plaintiff showed that he then lived in Bay City, Michigan, where he had resided since October 16, 1888. Previous to that time he had lived in Detroit 14 months; two years before that in Chicago; eight months before going to Chicago in Flint, Michigan, and for 23 years before living in Flint he had resided in Detroit steadily, and for 20 years at one place,—244 Park street. At the time of his arrest he was dealing in, and owner of, real estate in Detroit; and French, his companion, was also in the same business, and had an office on Griswold street.

Plaintiff first saw the article in the Free Press on the afternoon of February 12, 1888. Heard some parties speaking about it at the house where he boarded. After the publication, people halloed to him upon the street in different ways, and he also received letters in relation to it. At the time he was searched he had two fifty-cent American pieces, and two

five and one three dollar gold pieces, a diamond ring, and about $50 in money, including the gold pieces.

The defense showed the commission of the robbery at Bothwell by some unknown person on the night of February 4, 1888. William Regan, the postmaster at that place, testified that he discovered the robbery the next day, and at once notified the post-office inspector at London, Ontario. Bothwell is about 60 miles from Windsor. Regan testified that about $110 of Canadian postage stamps were taken, and about $80 in money,—gold, silver, and bills,—$194 in all, stamps and money. Some jewelry was also taken,—a watchchain and some charms,—and some gold pieces,—one five-dollar, one two and a half dollar, and two one-dollar gold pieces. The five-dollar piece was an American coin.

The defendant proved by Bartlett, the magistrate, that this robbery at Bothwell, under the laws of Ontario, was a felony, and the selling of stamps without license a misdemeanor. It also appears from his testimony that the complaint was withdrawn before McAllister and French were required to plead to it.

William Bains, the chief of police, was also sworn on behalf of the defendant. His main evidence was given in the attempt to justify his conduct towards the prisoners while in his charge, in which he was not successful. He testified that he gave no directions to have them arrested, and first saw them at the lock-up, where he went after hearing of their arrest. Before their arrest he had received from Mr. Parker, the post-office inspector at London, the following letter:

"POST-OFFICE INSPECTOR'S OFFICE,
"LONDON, 7 Feby., 1888.

"*Dear Sir:* I beg to inform you that on the night of Saturday, fourth inst., the Bothwell P. O. was burglarized, and some $200 in cash and postage stamps stolen from the safe. There was also a quantity of jewelry taken, the property of the postmaster's wife, consisting of 1 gold chain,

long, with fancy link; 2 lockets, silver, one with gold chain attached; 2 gold pencil cases; 1 $5 gold coin; 1 $2.50 do.; 2 $1 do.; 1 sovereign, with a hole in it, and the name 'Ella Rose' stamped across the face; 1 25c. gold coin. I will feel obliged if you will have such inquiry made by your staff for the stolen goods as you may deem necessary, as they may be offered for sale in your localitv.

"Yours truly,
"R. W. PARKER,
"P. O. Inspector.

"Mr. BAINS,
"Chief of Police, Windsor."

He was present when French and plaintiff were searched, and saw the articles found upon them, and, after they were locked up, reported the case to Mr. Bartlett.

He testifies that the finding of the stamps and the gold coins upon their persons, and the letter he had received from Parker, led him to believe or suspect that these men might have had something to do with the Bothwell robbery; that he sent an officer over to Detroit to find out about them, and to see Dr. Kennedy; that the officer returned about 6 o'clock P. M., and reported that the doctor said he had sold the stamps to French, and also that he had been to the magistrate, Bartlett, who instructed him to release them.

On cross-examination Bains testified:

"Q. Did you have any talk with the newspaper reporters about this matter?

"A. When these gentlemen left, one of them—I can't say which—turned and said to me: 'Don't give this to the papers. We don't want this in the papers;' and I said: 'Gentlemen, they will not get it from me.' That is what passed. Shortly after they passed through the front door, a reporter came to me and asked me about this matter, and I said: 'The gentlemen are released. It appears there is nothing against them, and I was requested not to let the papers have it.' Who that reporter was there for I can't tell you.

"Q. Do you know his name?

"A. No, sir, I don't; and I don't know what paper he was for.

" *Q.* You can't say whether he was a reporter for the Detroit Free Press ?

" *A.* I don't know.   That is the only reporter I spoke to about it."

The policeman who arrested them testified to arresting them on information that they were selling stamps at less than their face value.   He knew about the Bothwell robbery. The assistant postmaster told him of this, and pointed the men out to him.   He also knew of their trying to sell the stamps at two other places.   He claims he arrested them on suspicion of the Bothwell robbery.   He swears he did not talk with or give any information about the affair to any reporter.

Ira W. Quinby, exchange editor of the Free Press, testified that at the time of the publication of the alleged libel he was a reporter for that paper, and had been "doing" Windsor in that capacity for about two years.   He wrote both the items published in the Free Press in relation to the arrest of French and plaintiff.   He was in Windsor on the day of such arrest, and was in Bartlett's court room about 3 o'clock P. M., as near as he could remember.   While there he heard a conversation between Mr. Bains and the magistrate.   He had no conversation with Bains, but talked some with Bartlett.   He was not acquainted with plaintiff or French, and saw them for the first time when he testified.   He wrote the item about 6 o'clock P. M., and handed it to the city editor of the Free Press.   He was not in Bartlett's court over eight or ten minutes, and in Windsor but half an hour.

" *Q.* Where did you get the information which led you to write this article?

" *A.* When I came in, Mr. Bains was there talking with the magistrate about these two men.   Mr. Bains said there had been a burglary committed, and he thought that these two men were the ones.   That is what he was telling Bartlett at the time.   Mr. Bartlett was not so sure, but Mr. Bains was telling him the stuff he found on them, and he gave Bains permission to keep them until further developments.   I think I

arrived there shortly after they had been examined and returned to the cell. That is my impression now.

" *Q.* You didn't see these men in the court-room at any time?

" *A.* No, sir.

" *Q.* Did you hear anybody else talking about it besides Bains and the magistrate?

" *A.* No, sir, I did not. I talked with Bartlett afterwards, and he read the warrant that Mr. Wigle had sworn to; and Mr. Bartlett gave me the information that I got.

" *Q.* He gave you the information about the Bothwell robbery?

" *A.* Yes, sir.

" *Q.* Did you know about it before?

" *A.* No, sir; I hadn't heard about it.

" *Q.* Will you state whether or not the account was based upon the facts that you learned there?

" *A.* Yes, sir.

" *Q.* Will you state what, if anything, was said in that conversation about their being hard looking characters?

" *A.* Yes, sir. Mr. Bains, I think, said it. He said they were rather hard looking citizens. The idea that I got from it was that they were a couple of tramps, such as you see any day on the railroad. That is the impression conveyed to me."

He could not say that either Bains or Bartlett said that $2,000 in money had been taken from the Bothwell post-office, but expects they did, because he wrote it that way. Mr. Bartlett said that about $30 of stamps had been stolen at Bothwell. He also told witness that the men (plaintiff and French) were searched at the station, and $30 worth of stamps found upon them.

"*Q.* Who told you that they were hard-looking citizens?

"*A.* Mr. Bains said it to the magistrate. Nobody told me. There should be quotation marks there.

" *Q.* Who told you that they canvassed the business part of Windsor?

"*A.* The magistrate also.

"*Q.* Who told you that they were making an effort to sell the stamps at half-price?

" *A.* Mr. Bartlett.

"*Q.* Where did you get their names?

" *A.* I found them on the warrant."

He further testifies that he did not ask any particulars about these men; nobody seemed to know where they came from.

"I asked Mr. Bartlett if he knew who they were, and he said no, he did not.

"*Q.* Did you ask Mr. Bains?

"*A.* No, sir. You can't ask Mr. Bains anything when he is excited.

"*Q.* Was Bains excited?

"*A.* Yes, he was. Whenever Mr. Bains had criminals on hand, I would always go to Mr. Bartlett for information, because he didn't get so flustrated."

This reporter made no further effort to find out who these men were, or the particulars of the transaction, because, as he says, "there was no use." He testified that Bartlett was not so strong in his opinion that the men were connected with the burglary as Bains; but Bartlett told the reporter that Bains would hold them for developments. On Monday, about 3 o'clock P. M., he learned that the men had been released. Before he wrote the last item he went up to the court-house at Windsor. Bains and Bartlett were inside. Outside of the building he met a patrolman,—didn't know who he was, —and asked him about "the McAllister-French business." He said they were discharged.

"I said, 'What was the matter?' and he said, 'No evidence.' I said, 'Don't you know who they were?' and he said, 'No.'"

He claims he went back to the town-hall or court-house twice afterwards that day to see Mr. Bains, but he and Bartlett had gone to Sandwich.

"*Q.* When did you write that item?

"*A.* Monday night. It came out Tuesday.

"*Q.* Did you ever make any effort up to that time to find out whether they were reputable citizens or not?

"*A.* No, sir. It had slipped my mind."

Mr. Fralick, the city editor, was not sworn, but Mr. Quinby

testified that he didn't know that Fralick took any steps to find out about these men.   He heard nothing about the matter afterwards.

A. G. Boynton, one of the stockholders of the defendant company, was sworn for the defendant, and testified that he resided on Bagg street, which runs into Park street.

" *Q.* Some allusions were made by counsel in this case, in his opening, to the fact that you lived in the same neighborhood with Mr. McAllister.

" *A.* Mr. McAllister lived a neighbor to me for some years."

He testified that he was acquainted with plaintiff in a general way for some years, but never knew Mr. French until he saw him in the court-room.   Boynton never heard of the item complained of until it was published.

" *Q.* Did you read the item before it was published?
" *A.* No, sir.   I don't remember reading it at all."

It was not an item that came in his department, and he knew nothing of it until told that suit was brought, and then he hunted it up.

This is the substance of the material testimony taken in the case.   Mr. Bartlett having returned to Windsor, plaintiff's counsel asked the court to adjourn the case until the following morning, so that he could be produced for the purpose of contradicting the witness Quinby as to the source of his information.   The court declined to allow an adjournment, and exception was taken.

It does not appear from the record at what time of day this motion was made, and therefore we are not entirely satisfied that this refusal was an abuse of discretion; but it seems to us that the adjournment, in the interest of justice, should have been granted.   If the witness Quinby was not telling the truth as to his source of information, it was a very material fact to be considered in the case.   If the portions of the article acknowledged to be untrue were manu-

factured by the reporter, they were certainly not privileged. Such fact would also have a bearing upon the question of damages. If, as the reporter says, he did not get to the court-room of the magistrate until after the plaintiff and French had been taken out, the warrant read to them, and they returned to their cells, it is not likely that Bartlett gave the reporter the information he claims he did, if Bartlett's testimony on the trial is true. Mr. Bartlett testified as follows:

" *Q.* About what time upon this Saturday did Mr. Wigle make the complaint, and swear to it?

" *A.* I think between 2 and 3 o'clock.

" *Q.* Were the accused parties arraigned on that complaint?

" *A.* The complaint was read to them, I think.

" *Q.* What was done when it was read? Were they required to plead to it?

" *A.* Mr. Wigle appeared, I think, at the same time that they were there, and the complaint was read to these parties; but Mr. Wigle, by the time we read the complaint, had become convinced that they were innocent, so far as an intentional violation of the law was concerned, and he with-drew the complaint, and I think he withdrew it in the presence of these two parties."

He also testified that no complaint was made against them on account of the Bothwell robbery, and that such robbery was only a matter of conversation between him and the post-master, and he could not swear that Bains, the chief of police, informed him that he suspected these men of that robbery, but thought it quite probable that he did. Nor could he remember that there was any conversation between himself and Bains in regard to the circumstance of these parties having postage stamps that they were offering for sale. It would appear from the record that Mr. Bartlett was sworn for the defense, and had gone back to Windsor before Mr. Quinby was examined. The plaintiff was entitled to his testimony, unless the circumstances were such that it could have been procured that day without adjournment over.

This case clearly ought to have gone to the jury. The

item was confessedly untrue in several particulars; and these false items all tended, in the connection used, to carry the impression that plaintiff and French were guilty of a felony.

*First.* The coincidence, which was not a true one, that about $30 worth of stamps had been stolen from Bothwell, and the same amount found upon these parties.

*Second.* That they were "hard-looking citizens," carrying the impression, as Quinby admits, that they were a "couple of tramps."

*Third.* That they canvassed the entire business part of Windsor, in the effort to sell stamps at half price, which contains two untruths.

*Fourth.* That they *at last* tried to sell the stamps to the postmaster.

It requires but a glance to discover a vast difference between the actual facts of this transaction, and the story as published. A true account would have shown the arrest of two reputable American citizens for the offense of selling stamps without a license, discharged by the magistrate of such offense as soon as the complaint was read, because the postmaster was satisfied that they meant no intentional violation of the law, but kept by the chief of police of Windsor for three hours afterwards, and treated by him with gross indignity; that he had suspicions that they were connected with the Bothwell robbery, because of the stamps and gold coin found upon their persons, but he refused to let them communicate with their friends or counsel in Detroit, and did not release them until he was obliged to by the order of the magistrate, although he had learned that they were all right,—in short, an inexcusable outrage by the chief of police upon honest men, guilty of no crime, and innocent of any intentional wrong.

The publication shows a couple of tramps, trying at every business place in Windsor to sell postage stamps at half price, having the same amount in their possession that was

stolen at Bothwell the week before.   At last they try the postmaster, who has them arrested. .

"Chief Bains will hold them to await developments."

Before or about the time it was handed to the city editor, who, it seems, took no steps to ascertain its truth, these men had been discharged; and, when it was being read by people on Sunday in the Free Press, French and the plaintiff were at home in Detroit, as free from any restraint of the law, and from any suspicion of wrong-doing, except för this article, as the reporter who wrote it.

If it were not possible, as contended, that a true statement of the whole of the facts could have been published at that time, certainly a little inquiry on Monday afterwards by this same reporter might have set the matter aright.   But it was a matter of so small consequence to him that "it had slipped his mind," and he contents himself with the statement of a patrolman on the streets of Windsor, and the paper on Tuesday has an item that French and the plaintiff have been discharged because there was no evidence that they were the men wanted at Bothwell.   In other words, it is published, not that they were discharged because their innocence was established, which was the fact, but because the charge or suspicion that they were concerned in the Bothwell robbery was "not proven."

If the reporter had contented himself ,with stating that these men had been arrested, and a complaint made against them for selling stamps without a license, and that the fact of their offering to sell the stamps, and having them in their possession when searched, led the chief of police to think that they might be connected with the Bothwell robbery, and that Chief Bains was holding them to await developments, it might have been privileged, although not true at the time it was published, and not the whole truth at any time, which the reporter had the means and opportunity to discover, but did not.   But, as the case stood, it was not

privileged, and the only question for the jury was one of damages.

It will be noticed that the item as published was not in "quotation marks," as the reporter thinks some of it ought to have been. It was printed as a matter of fact coming from Windsor, when in fact it was written by an employé of the paper at Detroit, entirely from hearsay. He could have personally investigated the matter, but did not do so. He did not ask to see the men, or go where they were. He did not talk with the postmaster. He heard, as he says, a talk between Bains and Bartlett, and asked the latter a few questions. The only thing that he saw with his own eyes—the complaint—he does not mention in his publication. If he had stated the nature of it, it might not have carried so great an impression of the parties' guilt. The publication was looking towards a felony. The complaint he saw was only for a misdemeanor.

Nor was any care shown by the newspaper. It was, as far as the record shows, published as handed in by the reporter, without thought of verification. It is argued that a newspaper in this day and age of the world, when people are hungry for the news, and almost every person is a newspaper reader, must be allowed some latitude and more privilege than is ordinarily given under the law of libel as it has heretofore been understood. In other words, because the world is thirsting for criminal items, and the libel in a newspaper is more far-reaching and wide-spread than it used to be when tales were only spread by the mouth, or through the medium of books or letters, there should be given greater immunity to gossip in the newspaper, although the harm to the person injured is infinitely greater than it would be if published otherwise.

The greater the circulation the greater the wrong, and the more reason why greater care should be exercised in the publication of personal items. No newspaper has any right to

trifle with the reputation of any citizen, or by carelessness or recklessness to injure his good name and fame or business. And the reporter of a newspaper has no more right to collect the stories on the street, or even to gather information from policemen or magistrates out of court, about a citizen, and to his detriment, and publish such stories and information as facts in a newspaper, than has a person not connected with a newspaper to whisper from ear to ear the gossip and scandal of the street. If true, such publication or such speaking may be privileged, but if false, the newspaper as well as the citizen must be responsible to any one who is wronged and damaged thereby

It is indignity enough for an honest man to be arrested and put in prison for an offense of which he is innocent, and for which indignity ofttimes he has no redress, without being further subjected to the wrong and outrage of a false publication of the circumstance of such arrest and imprisonment, looking towards his guilt, without remedy. And no sophistry of reasoning, and no excuse of the demand of the public for news, or of the peculiarity and magnitude of newspaper work, can avail to alter the law, except, perhaps, by positive statute, which is doubtful, so as to leave a party thus injured without any recompense for a wrong which can even now, as the law stands, never be adequately compensated to one who loves his reputation better than money.

What is privileged in publications? The truth is privileged when published from good motives, and for justifiable ends. And that which is not true, but honestly believed to be true, and published in good faith, by one in the performance of a public or official duty, in certain cases, is also privileged.

This is so in the case of communications made to a body or officer having power to redress a grievance complained of, or having cognizance of the subject-matter of the communication, to some intent or purpose; and in cases where the

communication is made confidentially, or upon request, where the party requiring the information has an interest in know- ing the character of the person inquired after. So may a person be justified where he is honestly endeavoring to vindi- cate his own interests, as in the case of the slanderer of title, or guarding against any transaction which might operate to his own injury. See *Usher v. Severance*, 20 Me. 9, 16.[1] As is well said by Chief Justice Whitman, in that case:

"The case at bar is one of a publication addressed to no person or body of men having power to redress a grievance, and, it is rather superfluous to add, not a confidential communication to any one, and does not appear to have been designed to guard against any injury imminently threatening the individual interests of the publisher; nor does it present a case of words in themselves not actionable."

The liberty of the press, as the law now stands, is only a more extensive and improved use of the liberty of speech which prevailed before printing became general; and, inde- pendently of certain statutory provisions, the law recognizes no distinction in principle between a publication by the pro- prietor of a newspaper and a publication by any other person. A newspaper proprietor is not privileged, as such, in the dis- semination of the news, but is liable for what he publishes in the same manner as any other individual. Townsh. Sland. & Lib. § 252.

The judgment of the court below is reversed, and a new trial will be granted, with costs of this Court to plaintiff.

The other Justices concurred.

[1] Cited by counsel for appellant, with other authorities, in support of the proposition that the publication was not privileged, and that the case should have been submitted to the jury.