(60 South. 719.)

No. 19,010.

IRION v. KNAPP et al.

(Jan. 20, 1913.)

*(Syllabus by the Court.)*

1. BANKRUPTCY (§ 145*)—ESTOPPEL (§ 58*)— RIGHT TO SUE—SCHEDULES—REQUISITES— CHANGE OF POSITION.

The failure of a plaintiff in a libel suit to carry on the schedules filed in his bankruptcy proceedings, his claim for damages arising out of the libel, will not estop him from pursuing his action for libel, as the position of the defendant has been changed in no way by his failure to do so. It is essential, to maintain the plea of estoppel, that the one pleading it should have been put in a worse position by the act of the one against whom it is pleaded.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 205, 230–232, 234; Dec. Dig. § 145;* Estoppel, Cent. Dig. §§ 144, 145; Dec. Dig. § 58.*]

2. ASSIGNMENTS (§ 24*) — BANKRUPTCY (§ 145*)—CLAIMS ASSIGNABLE—CHOSE IN ACTION—TORTS—DAMAGES FOR SLANDER OR LIBEL — DAMAGES FOR PERSONAL INJURIES — ENFORCEMENT BY TRUSTEE.

A claim for damages, based on slander or libel, is a peculiarly personal action, which is nonassignable, therefore nonenforceable by a trustee in bankruptcy, and so it need not be placed on the schedule of a petitioner in bankruptcy. Moreover, the claim is not included as one assignable under the terms of the bankrupt act.

[Ed. Note.—For other cases, see Assignments, Cent. Dig. §§ 42–46; Dec. Dig. § 24;* Bankruptcy, Cent. Dig. §§ 205, 230–232, 234; Dec. Dig. § 145.*]

3. LIBEL AND SLANDER (§ 51*)—PRIVILEGED COMMUNICATIONS — INFORMATION TO PUBLIC BOARD.

A letter written to a member of a public board, giving information concerning the qualities, character, and past experiences of one seeking to be elected by that board to an important public position, is a privileged communication; and, where it was written without malice and in the interest of the best selection of a public official, it will not be considered libelous, although the statements therein reflect on the integrity and ability of the candidate.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 149, 150; Dec. Dig. § 51.*]

4. LIBEL AND SLANDER (§ 50*)—PRIVILEGED COMMUNICATIONS—FALSE STATEMENTS.

Even if the statements contained in the letter are not true, but are believed to be true

by an officer making them in the discharge of his duty, they are also privileged.

[Ed. Note.—For other cases, see Libel and Slander, Cent. Dig. §§ 149, 150; Dec. Dig. § 50.*]

Appeal from Civil District Court, Parish of Orleans; Porter Parker, Judge.

Action by Valentine K. Irion against J. Rollo Knapp and others. Judgment for defendants, and plaintiff appeals. Affirmed.

Armand Romain, of New Orleans, for appellant. Girault Farrar, of New Orleans, for appellee Knapp. Cage, Baldwin & Crabites, of New Orleans, for appellee Ledbetter.

BREAUX, C. J. A commissioner of food and drugs was to be elected by the State Board of Health on August 6, 1909. Plaintiff was a candidate for the office; but he was not elected, as his name was not even submitted to the board, and that body chose to elect another to the position.

Plaintiff brought this suit for damages in the sum of $110,000 against the defendant, on whom he charges his defeat; his contention being that he would have been elected, as the board stood five in his favor to two against him, had it not been for influence the defendant brought to bear against him. He charges that the defendant, in order to accomplish his defeat, assailed his good name and reputation in the community to the extent that it influenced the members of the board, who were favorable to his election to the last moments before the election was held. He alleges that one of the defendants wrote a letter in which he charged that plaintiff, as the president of the Co-operative Dental Manufacturing Company, domiciled in this city, grossly and wrongfully mismanaged the affairs of the company, as well as misapplied its funds. The letter contained a number of expressions that were anything but complimentary to the plaintiff.

Plaintiff in his petition charges that the charges that were brought against him were without justification, libelous, and unlawful, all for the purpose of injuring him and defeating him as a candidate; that, as the aspersions upon his good name came to his knowledge only a short time before the election was held on the date before mentioned, he was not prepared to meet the accusations; that, none the less, he sought to be heard, and was not allowed that right.

## Facts Relating to the Estoppel Pleaded.

Anterior to the date of plaintiff's candidacy, he availed himself of the bankrupt law and was adjudged a bankrupt. He filed a list of his liabilities and assets; but he did not include the claim upon which he has brought this suit. The position of plaintiff is that there was no necessity under the law of his including this claim; that it is not a claim one has to transfer to the trustee, it being a claim for damages growing out of a libel.

[1] We deem it proper to state in regard to the alleged estoppel, based on the alleged failure to surrender claims before mentioned, even if there was a failure, it would not operate as an estoppel. Not carrying the claim on the list is not an act of omission which can be classed as an estoppel, for defendants were not induced into any act or expense from which they were obliged to recede or change position. These are essentials in matter of estoppel. Defendants were not interested in any way, and really had no cause for concern. But, despite the misnomer estoppel, the grounds alleged by defendants as exceptions are sufficiently set forth to require a decision in regard to them.

[2] There was no failure to comply with the bankruptcy laws is our conclusion after having considered the grounds of exceptions alleged in the plea of estoppel. The bankruptcy law does not include the cause of action alleged by plaintiff as one to be sur-

rendered. Reading the different clauses of section 70 of the bankruptcy law (Act July 1, 1898, c. 541, 30 Stat. 565, 566 [U. S. Comp. St. 1901, p. 3451]), we have not found that any one of these clauses includes the action brought by the bankrupt for libel. On the contrary, we have found that action for "slander" and the like are not "usually considered assignable." Collier on Bankruptcy (9th Ed.) p. 1158.

Technically denominated, slander comes under the same rules, in the sense of the act cited, which apply to libel. The rights of action, as recited in the bankrupt act, are declaratory, and it has been held that the trustee or assignee "cannot enforce the rights of action of a peculiarly personal character." In re Haensell (D. C.) 91 Fed. 355; Sibley v. Nason, 196 Mass. 125, 81 N. E. 887, 12 L. R. A. (N. S.) 1173, 124 Am. St. Rep. 520, 12 Ann. Cas. 938; North Chicago St. R. Co. v. Ackley, 171 Ill. 100, 49 N. E. 222, 44 L. R. A. 180, and note.

The exceptions before noted were correctly overruled. We affirm the court's ruling.

### Privileged Communication.

[3] The pertinent facts are that plaintiff had been a resident of the city of New Orleans, a graduate of Tulane University, and a practicing dentist for a number of years. Sensitive about his good name and reputation, as men should be (he is the son of Judge Irion, who held a distinguished position at the bar and on the bench of this state), he keenly felt the charges which were brought against him. These charges grew out of his alleged mismanagement of a company in this city formed by a number of local dentists, known as the Co-operative Dental Manufacturing Company, of which plaintiff became the president. The corporation signally failed, and, as is nearly always the case, the stockholders of this company were very much disappointed; they greatly felt their loss;

it created bad blood; they spoke in no favorable terms of the plaintiff, the presiding officer. About the time of the failure, at plaintiff's instance, expert accountants examined the books and found a balance due him instead of a balance due by him. During the existence of the corporation, there were acts of the president which occasioned the censure of the stockholders; they charged that the funds were not used in accordance with the wishes of the board of directors. The fact remains that the expert accountants found that he was a creditor, and that, as to his alleged delinquency, there was no attempt made to bring suit before the courts.

Another chapter in this litigation is that, in the year 1908, the necessity of creating the office of a State Food Commission was agitated, and the year following the office was created, and a commissioner was elected by the members of the State Board of Health, as they were authorized to do, by statute. One of the defendants was a member of the Board of Health (Dr. Ledbetter). He is a distinguished member of the medical profession, and president of the local medical society. He favored selecting the very best man available for the position—a man who had thorough knowledge of chemistry, and not one, as was the plaintiff, with a purely theoretical knowledge of chemistry, only acquired during the courses usually followed in colleges and universities, which are entirely experimental and theoretical. This desire on the part of some of the members of the board and of citizens gave rise to discussion. The physician before named was particularly opposed to the employment of any other than a regular chemist—one who could analyze foods and drugs and determine for himself whether the goods examined should be offered to an unoffending and innocent public. There were no chemists about; they were in demand. Plaintiff was about to be elected; it was almost certain that he would suc-

·ceed in a few days, when the board met to elect the commissioner. Among those who favored the employment of a chemist was the editor of one of the influential daily newspapers (Mr. Norman Walker); he was called upon by plaintiff, who requested the support of the Times Democrat. Plaintiff was told by the editor that not only would that paper not support him, but, for reasons before mentioned, would oppose his appointment. This editor was in need of the skill of a dentist. He repaired to the office of the defendant J. R. Knapp. They (the editor and Knapp) were old acquaintances, members of the same class as students of law. While the dentist was rendering the needed service, the editor, undergoing treatment, found time to ask the dentist if he knew the plaintiff, to which the dentist replied that he had never seen any of his dental work, and therefore could not answer. The editor then said to him that he was not making inquiry about his professional skill; he only wished to know about his reputation, his executive ability, his integrity and general efficiency. He added that he asked for the information because he felt interested in the selection of a good and efficient officer as commissioner of foods and drugs, and further said that, if the dentist knew of any reason why the plaintiff should not be elected, it was his duty, as a good citizen, to impart the information, and not let an unfit man be selected. He further stated that the great trouble that newspapers had was the unwillingness of people to talk. Sometimes "people declined to give information, fearing personal trouble." Finally the defendant answered that· there were a number of dentists who knew of plaintiff's unfitness, and that he was not a man of executive ability, but loose and uncertain in his methods, as made evident by his management of the Co-operative Dental Manufacturing Company, of which he was the president. The dentist held shares in the company.

132 LA.—3

The editor soon afterward gave this information to one of the members of the Board of Health, now one of the defendants in this case. The editor on the day following called on the Governor of the state and said to him, preliminarily, that he had not supported him as a candidate for the office of Governor; that he, none the less, deemed it proper to inquire of the Governor whether the plaintiff had said to him that he (plaintiff) had the support of the press as a candidate for the office in question. The Governor evidently gave no thought to the editor's opposition or the fact that he had opposed him. He replied that he did not think that politics should have anything to do with selecting a candidate for the position; that, as it was a new office which was to be filled, he thought it advisable that the new incumbent should be met with encouragement and kind words in his new field, and should not be weighed down by unkind comments of an antagonistic press, and that that was his reason for inquiring at the time what would be the attitude of the press if plaintiff were elected. About this time the subject of the letter, to which we will refer in a moment, was mentioned in the conversation, and the Governor said, in substance, that he would be pleased to see the letter which reflected upon the competency of the plaintiff; he thought that the member of the Board of Health who had the letter should submit it to him. Upon learning this, the member of the board who had the letter called on the Governor and handed it to him to be read. From this time, the Governor ceased to take any interest in plaintiff's candidacy; he sent for plaintiff, who called at once, and told him, in substance, that which the letter contained, and informed him that it was very serious. (This is not gleaned from the Governor's evidence, for he was not a witness in the case; it was sworn to by other witnesses.) The Governor said to the plaintiff, when he called on him in answer to a telephone message,

that the charges were quite detrimental. To this plaintiff answered that he would immediately seek an audience with the board. He was naturally excited, and this condition gave rise to the suggestion, on the part of the Governor, that it would be well to avoid all scenes while seeking information about the charges.

Plaintiff was informed, when he appeared before the board, that the members had changed their minds; that all were against him, and he had no chance whatever of election. One who had not been a candidate was elected.

It does not appear that defendants were actuated by malice or with a desire of injuring any one; they sought nothing for themselves; and, from the weight of the testimony, we infer that they desired the election of another than plaintiff for the reasons before stated. That motive, considered in connection with the evidence of the case, cannot be condemned as malicious.

The damaging letter referred to above was only written by the defendant at the very earnest solicitation of the member of the Board of Health, who, even with more impressiveness than the editor before mentioned, stated that one was indifferent to his duties as a good citizen who declined to write any information which he had, and which the member of the board said was absolutely necessary in order to place the matter properly before the board, as it would not be convenient for the dentist Knapp to appear in time before the Board of Health. This letter contained the charges of mismanagement of the affairs of the company and misdirection of its funds.

It must be remembered that the plaintiff, as the president of the Co-operative Dental Manufacturing Company, had not been successful. One who undertakes the management of a company, in case of absolute failure, is exposed to incur the ill will of those who lose their investments. He is fortunate if he escapes stinging criticism and provoking censure, for in nearly every instance all failure is followed by imputation of fraud, culpability, and damaging reproaches.

The other defendant, the member of the Board of Health, with the earnestness of his nature, thought that plaintiff should not be appointed, as he did not think that it would be to the best interest of all concerned.

We have not found malice in any respect, although in some instances the parties went further than was necessary—beyond proper moderation—but we cannot condemn defendants as men who sought willfully and without proper cause to injure a fellow man under the circumstances. As there was no malice, it becomes exceedingly difficult to hold that damaging information intended exclusively for a board, is actionable, particularly as these medical boards (both local and state) are the important and useful boards of the state.

A communication is privileged whenever an officer acted sincerely in the discharge of a public duty. We are not prepared to hold that the member of the Board of Health to whom this letter was handed, with the understanding that it would be used only for the purpose intended—that is, to be read to the Board of Health—did not act sincerely in the discharge of a public duty. From that point of view, he is not liable. White v. Nicholls, 3 How. 266, 11 L. Ed. 591.

We quote the following from the syllabus in McAllister v. Detroit Free Press Co., 76 Mich. 338, 43 N. W. 431, 15 Am. St. Rep. 318:

[4] "The truth is privileged, if published from good motives and from justifiable ends; and that which is not true, but honestly believed to be true, and published in good faith by one in the performance of public or official duty in certain cases, is also privileged."

In the case now in hand for decision, there was no publication of the letter. True, it was handed to the Governor of the state in order to assist legitimately in the proper direction and management of these different boards.

Under the circumstances, the communication remained privileged, although it came to his attention.

A similar view was expressed in the following case: Mertens v. Bee Publishing Co., 5 Neb. (Unof.) 592, 99 N. W. 847.

For reasons stated, the judgment is affirmed.

MONROE, J. I concur in the decree.

PROVOSTY, J. I concur in the decree.