### REMBERT v. FENNER & BEANE *
(two cases).

Nos. 16390, 16604.

Court of Appeal of Louisiana. Orleans.

April 5, 1937.

*Appellant's application for rehearing granted May 3, 1937. Appellee's application for rehearing denied May 3, 1937. Writ of certiorari granted June 21, 1937.

Frank Wm. Hart, Bolan Burke, and Michel Provosty, all of New Orleans, for appellant.

Henry & Kelleher, of New Orleans, for appellee.

JANVIER, Judge.

Wm. S. Rembert is engaged in business in New Orleans as a dealer in investment securities. Fenner & Beane is a partnership engaged in business in New Orleans and elsewhere as brokers for the purchase and sale of investment securities and various commodities. In the conduct of his business it is necessary that Rembert purchase and sell for himself or his customers, through a firm of brokers authorized to do business on the New Orleans, the New York and other exchanges, and that at times he pledge securities to his brokers to secure any balances for which he may be indebted to them. In other words, he often places orders for the purchase or the sale of securities and deposits with his brokers "margins" sufficient in amount to make it reasonably certain that fluctuations in the market value of the securities will be protected by these margins. In such cases, when securities are purchased for his account, they are retained by the brokers in pledge to secure the unpaid portion of the price. The said "margins" are also applied where securities are sold "short"; that is to say, where they are not actually owned when sold and are sold in the hope that the price will drop and that then they may be purchased at the lower price and used to make delivery against the "short" sale.

On July 23, 1930, Rembert engaged Fenner & Beane as his brokers and executed at their request an agreement reading as follows:

"Customer's Contract

"7/23/1930.

"Fenner & Beane,
"New York, N. Y.
"Sirs:

"In consideration of your serving as my brokers I agree that you may handle my business in the following manner:

"First: That my transactions with you shall be subject to the rules and customs of the exchange on which the same may be executed.

"Second: That my debit balances with you at the end of each month shall be charged with interest at the average rate paid by you on your general loans for such month, plus any special rate that you may have to pay thereon, together with your usual charge to customers for maintenance of credit facilities.

"Third: That you may lend or pledge separately or in your general loans, in such manner and for such sums as you may see fit and without notice to me, all stocks, bonds, commodity contracts and things of value held in my accounts with you whenever I am indebted to or have a short position with you.

"Fourth: That you may close my accounts in whole or in part after previous notice to or demand on me at my address, whenever in your opinion my accounts are insufficiently margined. And in the exercise of this right you may make the purchases and sales as may be required and at such times and places as you may deem best and without advertising or prior notice to me thereof.

"This agreement shall cover purchases and sales of securities, commodities and contracts now or hereafter had by me through you on any exchange or market and shall continue until revoked by me in writing, but such revocation shall not affect any purchases and sales theretofore carried in my accounts and the closing thereof.

"Yours very truly,

"[Signed]   W. S. Rembert,
"Customer.

"This card to be returned to me when a/c is in balance.

"[Signed]   W. S. Rembert."

Various transactions were conducted until —according to plaintiff's petition—he "of his own accord closed said account as of November 28, 1932." Thereafter, on or about January 3, 1934, he again began to conduct transactions with the said brokers. During June, 1934, Rembert wrote to defendant partnership criticizing certain of its methods of conducting business, and as a result of this letter and because, also, of another complaint, defendant partnership, on June 19, 1934, wrote to him a letter reading as follows:

"Dear Sir:

"This will acknowledge receipt of your letter of June 6th, in which you allege that our firm violated the provisions of the Securities Act of 1933, and Section 3, Article 7 of the Code. My investigation does not disclose any violation on our part.

"Our attention has been drawn to a circular in which you commented unfavorably on Group Securities, Inc. The matter is in the hands of our counsel and of the attorneys of Distributors Group, Inc.

"Inasmuch as both of these instances indicate an unfriendly attitude on your part, we would appreciate your instructions to transfer your account to some other broker or bank."

Rembert received the above letter, but as he was preparing to leave New Orleans for a business visit to Chicago and, according to his testimony, was unusually busy preparing for that trip, he did not answer it. At that time defendants were holding for his account on "margin," certain securities which they had purchased for him and also certain securities which he had left with them to form a portion of the said "margin." It is conceded that —taking into consideration the market value of those securities at that time—he had a credit balance, or "margin" amply sufficient and that there was no necessity, so far as the safety of the account was concerned, for the sale of any of the said securities. Rembert left New Orleans on June 23 without having arranged to "transfer" his account "to some other broker or bank," as requested by defendant's letter of June 19th. On June 25th defendant partnership wrote another letter, which was sent to Rembert by registered mail and which was received at his office, but which, because of his office rule that no one other than himself should open his mail, remained unopened until after the occurrences which we shall hereafter relate. This registered letter read as follows:

"Dear Sir:

"On June nineteenth, we wrote you requesting instructions to transfer your account to some other broker or bank but, up to the present writing, we have not received them. It therefore becomes necessary for us to advise you that, unless you give us these instructions for immediate delivery of the account or your check in the sum of $5108.13 to cover your debit balance, we shall be obliged to enter orders to sell your stocks on or around the close of the market on Wednesday, June twenty-seventh.

"We trust you will not put us to the necessity of this alternative."

On June 27th defendants, having received no answer to either letter, nor instructions to transfer the account, telephoned Rembert's office and, being unable, because of his absence from the city, to communicate with Rembert, sold the securities which they were holding for him and sent to him a check for the balance which then remained to his credit. This check was received and used by him.

Rembert maintains that defendants were without right to sell his securities and that they are, therefore, liable for such losses as he sustained and for those losses he seeks judgment against the partnership and also against Charles E. Fenner and John McCorkle, who are alleged to be two of the members of the said partnership.

The claim is divided into two parts: It is alleged that $333.33 was loss sustained in repurchasing the securities which had been sold and $1,000 is alleged to represent the damage which plaintiff sustained to his reputation and as a result of loss of business due to demoralization in his sales force during a busy period of the year.

Defendants filed an exception of no cause of action, maintaining that the allegations

show that they were within their rights in selling the securities and particularly that the item of $1,000 claimed is uncertain and speculative and that the allegations of the petition show that no such actual damage could have been sustained except as the result of plaintiff's own actions in unnecessarily disclosing the situation to his employees and salesmen. The exception was maintained so far as the item of $1,000 was concerned and, from the judgment dismissing the claim on that item, plaintiff has appealed. The case was then tried on the remaining portion of the claim and judgment was rendered for defendants dismissing the suit entirely and from that judgment, also, plaintiff has appealed. The two appeals have been consolidated here.

We shall first consider the claim for the alleged loss due to the cost of replacing the securities, because a full discussion of the facts will render more easily understood our views on the exception of no cause of action which is directed at the other portion of the claim.

Plaintiff maintains that the transactions which terminated in the sale of the securities on June 27, 1934, were conducted between the parties under the written agreement of July 23, 1930, and he interprets that agreement as denying to defendants the right to sell securities pledged to them, except only for insufficient margin, and then only after reasonable notice. Defendants, on the other hand, without conceding that that agreement may be interpreted as plaintiff contends it should be, declare that it had been terminated by plaintiff himself and that the transactions leading up to the sale of the securities were had without any specific agreement between the parties, and should, therefore, be held to have been conducted subject to the customs and usages of the business of trading with and through security brokers and subject to the general laws on the subject.

Defendants, in contending that the written agreement had terminated, rely principally upon the allegations of the plaintiff's petition to the effect that "petitioner of his own accord closed said account as of November 28th, 1932." That allegation, if it stood alone, plaintiff might find difficulty in explaining. But it is followed immediately by other allegations to the effect that later he recommenced trading and that he has no recollection of having made any new agreement. The record shows that whenever brokers contemplate that it may

be necessary for them to repledge securities pledged to them by their customers they require a written contract such as that executed by Rembert, since it gives to them the right to "lend or pledge * * * all stocks, bonds * * *." Since it is conceded that the defendants required this right and could only obtain it by written agreement and since it is not shown that any other agreement was entered into, it is fair to assume that the parties, when Rembert recommenced trading, understood that he did so under the original contract. In view of this it is not difficult to understand his allegation that he closed his account on November 28, 1930, and then, on January 3, 1934, again opened his account without having signed a new contract.

But defendants argue that even the written agreement does not prevent the broker from terminating the relationship at will, subject only to reasonable notice, and that, since they contend that under the custom of the trade in the brokerage business, brokers at all times have the right, after reasonable notice, to discontinue the relationship and to sell securities held on margin, even the written contract relied upon by plaintiff should not be interpreted as denying this right.

A careful reading of the contract indicates clearly that the brokers are not thereby given the right to sell securities held in pledge unless for insufficiency of margin. While it may be true that, as a result of the custom established in the business, brokers have this right when there is no contract to the contrary, there is no evidence in the record before us which justifies the conclusion that such custom exists.

But counsel for defendants maintain that the relationship which exists between the broker and his customer is merely the relationship of principal and agent, and they cite article 3027 of our Civil Code, in which is set forth the various methods available for the termination of the relationship which exists between agent and principal and in which article it is declared that, among other ways of terminating the relationship, is that "by the attorney's renunciation of the power." The also call attention to R.C.C. art. 3031, the first paragraph of which provides that "the attorney may renounce his power of attorney by notifying to the principal his renunciation." Counsel also point to the fact that it is generally recognized, both here and elsewhere, that the relationship of principal

and agent is terminable at the will of either party, subject, of course, to reasonable notice. They cite the Law of Stock Brokers and Stock Exchanges, by Charles H. Meyer, in which, at page 360, the author states:

"We have seen that the relation of customer and broker, not being entered into for any specific period of time, is ordinarily terminable at the will of either party and that accordingly the customer may close his contract with his broker at any time and obtain possession of his securities upon demand and tender of his indebtedness.

"The broker similarly has the right to terminate at will long transactions, that is transactions where he is carrying securities purchased for the customer on margin, irrespective of whether or not the margin is sufficient. The relation between the parties being terminable at will, may be ended with or without cause."

▌ That this is true there can be no doubt, but the fact overlooked is that, though the original relationship between customer and broker is that of principal and agent, after the purchase of securities on margin, or after the placing of securities with the broker under pledge as margin, there comes into existence a secondary relationship under which the customer becomes the pledger and the broker the pledgee. In that case the broker lends to the customer the difference between the margin deposited and the purchase price of the securities and, to secure this loan, the broker accepts the securities in pledge. As soon as this is done the relationship between the parties, quoad the securities, is pledger and pledgee and that is a relationship which, though it may be terminated at will by either party on reasonable notice, may only be terminated in the manner provided by law, unless there is an agreement permitting termination in some other manner.

This secondary relationship is recognized by Mr. Meyer in his well-known work, for, in subsection 3 of section 41, in discussing the "broker's relations with customer," he says:

"We have seen that in executing an order, the relationship of the broker to his customer is that of agent and that the broker's obligations and rights are governed by the general principles of the law of agency.

"In the purchase of securities on margin, however, the execution of the order is only the first function of the broker. The next and equally important one is providing of funds necessary to acquire the securities, and to carry them until the customer orders them sold. When security purchases are made on margin, the customer in some instances furnishes a portion of the purchase price and the broker furnishes the remainder. In other instances, and perhaps the more frequent ones, the broker furnishes the entire purchase price and receives from the customer a deposit of other securities as collateral. In either case, however, the broker is required to furnish funds for the completion of the purchase.

"It is well settled law that in providing these funds the broker does not act as agent of the customer. The funds which he provides are his own. Accordingly, he becomes a creditor of the customer and since he holds the customer's security as collateral, there is created between the customer and himself the relation of pledgor and pledgee."

Counsel cite many authorities which hold that the broker, when he intends to terminate the relationship for reasons other than shortage of security, may do so upon reasonable notice, and, in support of this statement, they rely again upon Mr. Meyer, who, at page 362, says:

"When the broker elects to close the transaction, for reasons other than a shortage of security, the notice to the customer of the intention to close it should afford the latter a reasonable opportunity to replace the transaction by a sale through some other agency. If, after making a proper demand and giving the customer reasonable notice and opportunity to place his account with another broker, the customer nevertheless fails to pay his indebtedness and take up his stocks, the broker may then close out the account and enforce his lien by sale."

We have no doubt of the soundness of the views as just above expressed by Mr. Meyer, but we feel that counsel has overlooked the difference between the right to terminate the relationship and the method which must be adopted where it is desired to effect such a termination. Our Civil Code plainly provides that where it is the desire of the pledgee to terminate such relationship he may not sell the securities which have been pledged until after obtaining a judgment against the pledger for

the balance which may be due and for the security of which balance the securities have been pledged. Article 3165, R.C.C. reads as follows:

"The creditor can not, in case of failure of payment, dispose of the pledge; but when there have been pledges of stock, bonds, or other property, for the payment of any debt or obligation, it shall be necessary before such stocks, bonds or other property so pledged shall be sold for the payment of the debt, for which such pledge was made, that the holder of such pledge be compelled to obtain a judgment in the ordinary course of law, and the same formalities in all respects shall be observed in the sale of property so pledged as in ordinary cases; but in all pledges of movable property, or rights, or credits, stocks, bonds or other movable property, it shall be lawful for the pledger to authorize the sale or other disposition of the property pledged, in such manner as may be agreed upon by the parties without the intervention of courts of justice; provided, that all existing pledges shall ·remain in force and be subject to the provisions of this act."

██ But counsel for defendant argue that this requires that the relationship continue beyond the will of the parties; in other words, that it is unreasonable to say that an agent who is given the right to terminate the relationship at will on reasonable notice may be compelled to retain as a customer a principal whom he may not desire to retain. The broker, of course, for any reason at all, or without reason, may refuse to continue to do business with a former customer. He may, upon reasonable notice, without giving any cause, refuse to purchase or sell securities for that customer, no matter how long the relationship may have been in existence, but if, coupled with that relationship, there is the relationship of pledger and pledgee, he can terminate that second relationship only by taking the steps provided by the law. It has many times been held that by agreement the parties may provide for the sale, even privately, of the pledged article, but never has there been any judicial declaration that article 3165, in the absence of such an agreement, permits the sale except as the result of judicial proceedings.

██ Defendants were, therefore, not within their rights in disposing of plaintiff's securities without first obtaining a judgment against him, however arbitrary and unreasonable may have been his failure or refusal to arrange to transfer his account to other brokers, and on this question we quite agree with our . brother below that either the letter of June 19, or the registered letter of June 25, constituted ample notice under the circumstances, and that the plaintiff should have transferred his account.

It may be argued that the damage which plaintiff claims to have sustained was sustained as the result of his failure to transfer his account and would none the less have been sustained had defendants complied with the requirement of article 3165 and filed suit in an effort to obtain the judgment required by that article. In fact, it might well be that the damage would have been greater had suit been filed, but we have no right to speculate on that question. That plaintiff did sustain damage by the sale there can be no doubt, since the cost of replacing the securities was admittedly $333.33, and that the sale was illegal we believe we have already shown. It follows that there is liability to that extent.

We next consider the claim of plaintiff that his business was damaged and his reputation suffered in the eyes of his employees and salesmen. The allegation which sets forth this claim reads as follows:

"That petitioner is now, and was on the dates hereinabove mentioned, engaged in the business of selling securities in the City of New Orleans, through salesmen, who solicit orders under petitioner's direct supervision. That the unwarranted action of Fenner & Beane, in selling petitioner's securities, and closing out his brokerage account, as hereinabove set forth, was done in such a way as to forcibly bring to the attention of petitioner's office force and salesmen, that this had been 'done, without petitioner's consent, while he was out of the City, and had the effect of instilling ·into petitioner's salesmen the belief that his credit was impaired, resulting in practically a cessation of their selling activities for the first two weeks in July, which, except for the same period in January, is the period when petitioner's salesmen have always made their largest sales. That due to the necessity of having to adjust his private affairs, in order to take care of the situation brought about by the aforesaid unwarranted and unauthorized acts of Fenner & Beane, petitioner, during this period, was unable to give his undivided attention

to his business, or to take the necessary steps to restore the confidence of his salesmen, or to undertake the direct supervision of their selling activities. That, as a direct result of the aforesaid acts of Fenner & Beane, petitioner has been damaged to the extent of One Thousand Dollars, ($1,000.00), in reputation, loss of business, mental worry, annoyance and inconvenience, and he is entitled to judgment against said Fenner & Beane for that amount."

■ As we have said, the exception of no cause of action was sustained in so far as it applied to this claim. We, therefore, treat the matter as though the action of the trial judge, in sustaining the exception in so far as it applies to this claim, was merely a ruling to the effect that no evidence would be considered touching upon this particular item because, where an exception of no cause of action is directed at an entire petition and is sustained only in so far as certain items are concerned, it is obvious that a cause of action has been stated as to the other items and that the case should be permitted to go to trial as to those other items and that the only effect of the judgment sustaining the exception as to objectionable items is to exclude evidence touching upon those items. This was held in Trcka v. Bragmans Bluff Lumber Co., 168 La. 805, 123 So. 332.

■ It thus becomes our duty to determine whether the judge a quo was correct in excluding—by sustaining the exception—evidence touching upon that portion of the claim. We cannot understand how plaintiff suffered any damage to his reputation, or any loss of business, even if it be conceded that every allegation of fact made in his petition is true, for he shows very plainly that no knowledge of the various transactions could have come to his employees except from him. His office rule prevented the opening of his mail in his absence and there is no allegation of fact which shows that defendants communicated to petitioner's office force anything which would have in any way demoralized any member of the said force or given the impression that their employer was in any way improperly involved, or in any way financially embarrassed. The entire situation is shown plainly to have resulted not from financial embarrassment, but purely from disagreement between plaintiff and defendants, and we are well convinced that the sale of the securities could not, of itself, have created in the minds of plaintiff's employees any

idea that he was financially embarrassed, or that there was any reason why they should feel insecure, or should discontinue their efforts to sell securities even if knowledge of the sale had been communicated to them. This claim, as set forth in the petition, is fantastic and speculative.

■ Defendants have presented the argument that the acceptance by plaintiff of the check which was sent to him, when his securities were sold, constitutes either an estoppel against him, or "accord and satisfaction." The acceptance by plaintiff of the check did not, we think, estop him to present an additional claim for damages because defendants were in no way nor to any extent misled or prejudiced thereby, nor was plaintiff's position benefited improperly, or unduly advantaged. The amount remitted was admittedly due in any event and it is well settled that under such circumstances no estoppel results unless undue prejudice has been created to the position of the other party, or unless the other party has been lead to change his position by the act which is pointed to as constituting estoppel. In re Clover Ridge Planting & Mfg. Co., 178 La. 302, 151 So. 212; Hebert v. Champagne, 144 La. 659, 81 So. 217; Irion v. Knapp, 132 La. 60, 60 So. 719, 43 L.R.A.(N.S.) 940; Coleman et al. v. Jones & Pickett et al., 131 La. 803, 60 So. 243; Des Allemands Lumber Co. v. Morgan City Timber Co., 117 La. 1, 41 So. 332; Maddox v. Robbert, 158 La. 394, 104 So. 183; Farley v. Frost-Johnson Lumber Co., 133 La. 497, 63 So. 122, L.R.A.1915A, 200, Ann.Cas.1915C, 717.

■ Nor do we think that compromise or "accord and satisfaction" can be said to have resulted from the acceptance by plaintiff of the check in question. It is true that, in Davis-Wood Lumber Co. v. Farnsworth & Co., 171 So. 622, we reviewed the jurisprudence of this state and held that under certain circumstances the acceptance of an amount admittedly due may nevertheless constitute compromise or accord and satisfaction. But there, and in all of the other cases cited, there was something in writing, as there must always be, where compromise is involved, which was interpreted as indicating an intention of the parties to put an end to controversy. Here there was nothing of that kind. There was no dispute involved at the time the check was accepted; there was nothing in writing on the check or elsewhere which in any way indicated an intention to accept

the check in settlement of any other claim than that for which it purported to be payment.

Since we are unable to agree with defendants on any of the contentions presented so far as the claim for $333.33 is concerned, it becomes necessary that we reverse the judgment which dismisses the suit entirely. It is true that, in effect, the judgment rendered on February 11, 1935, and signed on February 15, 1935, in which the exception of no cause of action is maintained in so far as the claim of $1,000 is concerned, is approved, but we nevertheless feel that, under the circumstances, the costs of the appeal taken from that judgment should be borne by defendants-appellees.

It is conceded that Fenner & Beane is a commercial partnership and that Charles E. Fenner and John McCorkle, the other two defendants, are members of the partnership. They are, therefore, liable solidarily. R.C.C. art. 2872.

It is therefore ordered, adjudged, and decreed that the judgment rendered on November 24, 1936, and signed on December 1, 1936, be and it is annulled, avoided, and reversed, and that there now be judgment in favor of William S. Rembert and against Fenner & Beane and Charles E. Fenner and John McCorkle, jointly, severally and in solido, in the full sum of $333.33, with legal interest from judicial demand and for all costs.

Reversed.

WESTERFIELD, J., absent, takes no part.