[No. 14997. Department Two.—August 31, 1893.]

# H. J. EDWARDS, RESPONDENT, *v.* SAN JOSE PRINTING AND PUBLISHING SOCIETY ET AL., APPELLANTS.

| 99 | 431 |
| 102 | 347 |
| 99 | 431 |
| 105 | 257 |
| 99 | 431 |
| 114 | 273 |
| 99 | 431 |
| 119 | 680 |
| 119 | 681 |
| 99 | 431 |
| 124 | 197 |
| 99 | 431 |
| 132 | 227 |
| 132 | 228 |

LIBEL—CORRUPTION OF VOTERS—"CHARGE OF SACK"—WORDS LIBELOUS PER SE—INSTRUCTION—SUBJECTION TO OBLOQUY.—A newspaper article, which in referring to a city election, states that a large sum of money is to be put up by a corporation to corrupt voters, of whom there were a large number who could be bought, and that "it is reported that Edwards is to have charge of the sack," is libelous *per se,* and imports the use of a fund for purposes of corruption; and it is proper to instruct the jury in an action against the proprietors of the newspaper for damages for such libel, that the article upon its face imputed to the plaintiff conduct or the possession of a character which would lead him to commit acts, and that he was about to commit acts which, if true, would subject him to obloquy in the community.

ID.—COVERT MEANING OF WORDS—PROOF OF LIBELOUS SENSE—WORDS IN GENERAL USE—JUDICIAL NOTICE.—When a slander or libel is couched in language having a covert meaning not apparent upon its face, or in words or phrases not used otherwise than as slang, or cant terms, it is necessary for a plaintiff not only to allege and prove the slanderous or libelous sense in which the words were used by the defendant, but also that they were understood in the same sense by those to whom they were addressed; but where the words are in general use they will be understood by the court in the same sense in which they are usually understood by the masses of men, and no allegation or proof of such meaning is necessary.

ID.—MITIGATION OF DAMAGES—GOOD FAITH OF EDITOR—IMPROPER EVIDENCE—GENERAL REPORT.—The testimony of the editor of the newspaper in which the alleged libel was published, to the effect that reports came to him from various parties, whose names the witness did not give, that the plaintiff was a political manipulator, and that he would use money as he had done theretofore; but not showing that any reliable person professing to have any knowledge of the fact gave him any information to the effect that the plaintiff was to corruptly disburse money for the purpose of bribing voters in the election then to occur, is properly excluded as not tending to bring the defendants within the protection of the rule permitting the mitigation of damages when a publication reflecting upon the character of another has been made in good faith.

ID.—BELIEF OF EDITOR—RELIABLE INFORMATION—PROOF OF INVESTIGATION.—The mere belief of the editor of a newspaper in the justice and truth of an attack which he makes upon the private character of a citizen, is no defense to an action brought by the person assailed for the damages sustained by such attack; nor can such belief be considered in mitigation of damages, unless it is shown to have been based upon information derived from a reliable source. It must be shown that the charge was only made after due investigation of the matter to which it relates.

ID.—LIBERTY OF PRESS.—The liberty of the press is not more under the protection of the constitution than the liberty of speech, and the publisher of a newspaper can only defend an action for libel, or mitigate the damages to be recovered therefor, upon precisely the same grounds as any other individual could defend an action for slander in uttering the same words upon the street.

ID.—EVIDENCE OF PRIOR ACTS OF PLAINTIFF—KNOWLEDGE OF DEFENDANTS.—Evidence of witnesses offered for the purpose of proving particular acts of the plaintiff in relation to the use of money in elections, prior to the publication of the libel set out in the complaint, is inadmissible in the absence of a show-

ing, or an offer to show, that the defendants had knowledge of such acts when they made the publication complained of.

ID.—REPUTATION OF PLAINTIFF—DAMAGES—INSTRUCTION.—Where the evidence was conflicting as to the plaintiff's previous reputation, an instruction to the jury, asked by the defendants, that in case they found "that plaintiff, prior to the publication, bore a bad reputation as to the point wherein he claims to be damaged, you may fix nominal damages only" is properly refused, as the jury even if they found the character of the plaintiff to be bad could not be restricted to nominal damages in their verdict, unless they believed that such damages would fully compensate the plaintiff, and that exemplary damages should not be given.

APPEAL from a judgment of the Superior Court of Santa Clara County, and from an order denying a new trial.

The facts are stated in the opinion of the court.

*S. G. Tompkins*, and *F. E. Spencer*, for Appellants.

The instruction to the effect that the article was upon its face libelous, was error, as. it was for the jury to decide its import and meaning from the evidence. (*Van Vactor* v. *Walkup*, 46 Cal. 124, 133; *Dexter* v. *Taber*, 12 Johns. 239; *Goodrich* v. *Woolcott*, 3 Cowen, 240; Townshend on Libel and Slander, sec. 284.) It was error to strike out the evidence of the defendant's editor that he honestly believed that the plaintiff was intending to corrupt voters, as such evidence was admissible in mitigation of damages. (*Morris* v. *Lachman*, 68 Cal. 112; *Huson* v. *Dale*, 19 Mich. 35; 2 Am. Rep. 66; *Farr* v. *Rasco*, 9 Mich. 353; 80 Am. Dec. 88.) The court erred in excluding the testimony offered to show that the plaintiff was a corrupter of voters. (Townshend on Libel and Slander, p. 357.) The court erred in refusing to give the instruction asked by defendant to the effect that in fixing the amount of damage it was proper to take into consideration the reputation of the plaintiff as to the point wherein he claimed to have been damaged. (*Moyer* v. *Moyer*, 49 Pa. St. 210; Townshend on Libel and Slander, sec. 412; *Taylor* v. *Robinson*, 29 Me. 323.)

*Richards & Welch*, for Respondent.

The article complained of is a libel *per se:* (*Wilson* v. *Fitch*, 41 Cal. 378; Civ. Code, sec. 45; Newell on Defamation, Libel and Slander, p. 305; Odgers on Libel and Slander, pp. 97, 98.)

The testimony of the editor that he believed the article to be true was properly stricken out as such belief is no defense to the action. (Townshend on Libel and Slander, pp. 140, 357, 374.) An editor has neither license, liberty, privilege, nor prerogative to publish libels. (*Sheckell* v. *Jackson*, 10 Cush. 25; *Sweeney* v. *Baker*, 13 W. Va. 158; 31 Am. Rep. 757; *Mallory* v. *Pioneer Press Co.*, 34 Minn. 521; *Usher* v. *Severance*, 20 Me. 9; 37 Am. Dec. 33; *Barnes* v. *Campbell*, 59 N. H. 128; 47 Am. Rep. 183.) It is not a legal excuse that defamatory matter was published with good motives or with an honest belief in its truth. (*Moore* v. *Francis*, 121 N. Y. 199; 18 Am. St. Rep. 810; *Henderson* v. *Fox*, 83 Ga. 233.) The editor and publisher of a newspaper cannot evade responsibility for his act by the simple statement that he believes the baseless rumor to be true. Before testimony of the belief of a libeler in the truth of his publication can be received in mitigation of damages, it must be shown to be an honest belief, based upon a proper investigation and supported by such facts as would furnish some reasonable foundation for the belief. (*Morgan* v. *Rice*, 35 Mo. App. 591; *Bronson* v. *Bruce*, 59 Mich. 467; 60 Am. Rep. 307.) The court did not err in excluding the testimony offered to show that the plaintiff was a corrupter of voters, as evidence of particular acts is not admissible to prove bad character in mitigation of damages. (Newell on Defamation, Libel and Slander, p. 890; Odgers on Libel and Slander, p. 304.) The evidence was also inadmissible because the specific acts attempted. to be proved were not shown to be known to the defendants at the time of trial. (*Hatfield* v. *Lasher*, 81 N. Y. 246; *Willover* v. *Hill*, 72 N. Y. 36.) The refusal of the court to give the instruction asked by defendants with reference to the reputation of the plaintiff was not error. (Civ. Code, sec. 3294.)

DE HAVEN, J.—The complaint in this action alleges. that the defendants published in a certain newspaper, of and concerning the plaintiff, a false and malicious writing in the words following:—

"VENALITY.—It is understood that the Electric Improvement Company will put a large sum of money into the fight to-day to corrupt voters. There are scores of voters in every

community that money can buy. . . . . It is also reported that Edwards is to have charge of the sack."

The plaintiff further alleges that on the day of the publication of this article there was held an election in the city of San Jose, for the election of certain officers of the city, and that there was an active contest between the several political parties for the success of their respective candidates, and that by the words "into the fight to-day" in the said publication, the defendants meant to say and were understood to mean "into the election contest to-day."

The complaint contained the further allegation: "That by the sentence and expression in the above publication 'that Edwards is to have charge of the sack,' the said defendants, and each of them, intended to be understood and were understood to mean that the plaintiff herein was to expend and direct the expenditure of a large sum of money, of the said Electric Improvement Company of San Jose, to buy votes and corrupt the voters of said city in said city election." The answer of defendants contained among other matters a denial of this allegation of the complaint, and also alleged by way of further defense to the cause of action stated in the complaint, that prior to the publication of the alleged libel there was a report, or rumor, current in the city of San Jose, "and the same came frequently to the ears of the defendants, that the Electric Improvement Company in plaintiff's complaint mentioned was to place a large sum of money in said fight or election contest in the city of San Jose, for the purpose of corrupting voters, and that H. J. Edwards was to have charge of the sack, and that defendants in good faith believed the report to be true for the reason, among others, that plaintiff's reputation for having charge of money for the purpose of manipulating politicians or corrupting voters was bad, and for the further reason that plaintiff had on various previous occasions control of large sums of money to be used for the purpose of manipulating politicians and corrupting voters in elections"; and then the answer proceeded to specify the dates when and the different amounts in the hands of the plaintiff for such purposes upon the dates given. The defendants further alleged that the publication complained of was made by them in good faith and in

the interest of good government.    The case was tried by a jury and the plaintiff recovered a judgment for the sum of seven hundred and fifty dollars and costs, and the defendants appeal. The plaintiff introduced no evidence to show the meaning of the sentence, "It is also reported that Edwards is to have charge of the sack," contained in the alleged libel, or that defendants thereby were understood to mean that plaintiff was to expend and direct the expenditure of money to buy votes and corrupt voters in the election mentioned in the complaint; and the defendants moved for a nonsuit upon this ground, which motion was denied; and the court in submitting the case to the jury instructed them that the article complained of was a libel *per se,* and that upon its face it imputed "to the plaintiff conduct or the possession of a character which would lead him to commit acts, and that he was about to commit acts, which, if true, would subject him to obloquy in the community." The defendants insist that this instruction was erroneous, and that their motion for a nonsuit should have been granted, and, in support of their position, contend that the word "sack," according to the ordinary definition given by lexicographers, does not import a corruption fund, and that, if it has any such peculiar meaning attached to it as a slang phrase, it was incumbent upon plaintiff, not only to so allege, but also to prove such meaning, and that the word was understood to have such meaning by persons reading the article complained of.

There can be no doubt that when a slander or libel is couched in language having a covert meaning not apparent upon its face, or in words or phrases not used otherwise than as slang, or cant terms, it is necessary for a plaintiff not only to allege and prove the slanderous or libelous sense in which the words were used by the defendant, but also that they were understood in the same sense by those to whom they were addressed. The following cases may be cited to sustain this proposition: *Maynard* v. *Fireman's Fund Ins. Co.,* 34 Cal. 48 ; 91 Am. Dec. 672; 47 Cal. 207; *Andrews* v. *Woodmansee,* 15 Wend. 232.

But we are of the opinion that this case does not fall within the rule just stated.    Courts cannot affect to be ignorant of the recent meaning which the word "sack" has acquired in the current newspaper literature of the day, when used in the connec-

tion in which it appears in the publication complained of. As thus used it signifies a fund in hand to be used for purposes of corruption; and to say that a person has charge of such a fund to be used on a given occasion is, in effect, to say that such person is to disburse the fund for the purposes of corruption. This meaning was doubtless first given to the word by vile and corrupt persons, engaged in distributing and receiving such funds, and, when first used in that sense, might well have been regarded as a slang expression, of the meaning of which courts would not then have taken judicial notice, but it is now so frequently used to convey this particular meaning, that it can hardly be considered, when employed for that purpose, as simply the language of slang and understood only by the vulgar. In the case of *Bailey* v. *Kalamazoo Pub. Co.*, 40 Mich. 251, the plaintiff, a minister, brought an action for the recovery of damages for a libel couched in the following words: "Then there was that Iowa Beecher business of his which beat him out of a station at Grass Lake. But pshaw! These reformers are pretty much all alike." The trial court left it to the jury to determine whether this language involved a charge of adultery; and the court, in speaking of this, said: "It was set forth in the declaration as intended to charge adultery, and the justificatory notice did not except it. Moreover, inasmuch as courts have no right to be ignorant of the meaning of current phrases which everybody else understands, it can hardly be seriously urged that such a charge, coupled with an averment that it lost a minister his situation, and backed with a justification, should be assumed without some explanation to be capable of an innocent meaning. Defendant was bound to show a loss of position at Grass Lake upon some charge of immoral conduct affecting the plaintiff's clerical character in order to justify this charge."

Indeed, the law may now be considered as settled that courts will understand words in general use in the same sense in which they are usually understood by the masses of men, and that no allegation or proof of such meaning is necessary; and, under this rule, the plaintiff was not required to allege or prove the meaning of the word "sack," as used in the alleged libel, or how it was intended to be or was understood by persons reading

it, the word having a well understood meaning in the connection in which it is there used.

The editor of the newspaper in which the alleged libel was published, and one of the defendants in the case, was a witness upon the trial and testified as follows: " These reports came to my ears from various parties whom I cannot mention.  I know that many people said to me that Mr. Edwards was a political manipulator and that he would use money as he had done heretofore.  It was from a knowledge of these facts that I have hinted at that told me — rumors that reached me from various parties that led me to the proposition — but you will notice that I did not charge Mr. Edwards with the use of money, but only stated that it was expected, reported, that he was to have charge of the sack.  The whole libel lies right in that, and I used the license and liberty which I had as editor of the paper to announce it. . . . . As to the names of the parties who reported these rumors, I presume there were dozens of them; I do not know. . . . . I used my editorial prerogative to announce that fact, and I did it for the purpose of warning the company against anything of that kind . . . . I did it for a good purpose, and to prevent the very thing which it was feared would occur." This testimony was, on motion of plaintiff, stricken out, and the ruling of the court upon the motion is assigned as error by the defendants.  It is claimed by them that this evidence was admissible in mitigation of damages, and that it tended to show good faith and want of malice in the publication.  We think, however, that the evidence was properly excluded.  The mere belief of the editor of a newspaper in the justice and truth of an attack which he makes upon the private character of a cit'zen is no defense to an action brought by the person assailed for the damages sustained by such attack; nor can such belief be considered in mitigation of damages, unless it is shown to have been based upon information derived from a reliable source.  It must be shown that the charge was only made after due investigation of the matter to which it relates.  In the case of *Bronson* v. *Bruce*, 59 Mich. 475; 60 Am. Rep. 307, it is said: " If the charges were false and made in an honest belief of their truth, after reasonable and proper investigation, such fact would go to mitigate damages, and under certain circumstances . . . . the

jurors would · be warranted in reducing the damages to a minimum."

And in *Wilson* v. *Fitch,* 41 Cal. 388, this court said: "Nor can a defamatory publication in a public journal be said to be privileged simply because it relates to a subject of public interest and was published in good faith, without malice, and from laudable motives. No adjudicated case that I am aware of has ever gone so far. But whilst such publications cannot be·deemed privileged, so as to require proof of express malice, the publisher, in order to rebut the presumption of malice, should be allowed the fullest opportunity to show the circumstances under which the publication was made, the sources of his information, and the motives which induced the publication. The public interest and a due regard to the freedom of the press demands that its conductors should not be mulcted in punitive damages for publications on subjects of public interest, made from laudable motives, after due inquiry as to the truth of the facts stated, and in the honest belief that they were true." The testimony stricken out did not tend to bring the defendants within the protection of this rule, which permits the mitigation of damages when a publication reflecting upon the character of another has been made in good faith. It only tended to show that others, whose names the witness did not give, believed or suspected that the plaintiff would be guilty of using money to influence the election then pending. The witness did not sta'e · that any reliable person professing to have any knowledge of the fact gave him any information to the effect that plaintiff was to corruptly disburse money for the purpose of bribing voters in the election then to occur. If he received any such information it was also important to state the name of the informant, that the jury might judge whether his character was such that the defendant might reasonably have placed reliance upon his statements. The last sentence of the publication, "It is reported that Edwards is to have charge of the sack," imports something else than that there was an idle rumor to that effect, not entitled to credit or consideration. It is equivalent to the assertion that there was a well founded report to that effect, and one which the publishers, after due inquiry and investigation, believed to be true, and in effect was the same as a direct charge

of the fact, and to enable defendants to mitigate the damages resulting from such a statement it was incumbent upon them to give the sources of their information, and to show that their informants were possessed of such character and standing as would command a belief in the truth of their utterances.

The liberty of the press is not more under the protection of the constitution than the liberty of speech, and the publisher of a newspaper can only defend an action for libel or mitigate the damages to be recovered therefor upon precisely the same grounds as any other individual could defend an action for slander in uttering the same words upon the street. "The liberty of the press, as the law now stands, is only a more extensive and improved use of the liberty of speech which prevailed before printing became general; and, independently of certain statutory provisions, the law recognizes no distinction in principle between a publication by the proprietor of a newspaper and a publication by any other person. A newspaper proprietor is not privileged as such in the dissemination of the news, but is liable for what he publishes in the same manner as any other individual. (*McAllister* v. *Detroit Free Press Co.*, 76 Mich. 338; 15 Am. St. Rep. 318.)

The court did not err in excluding the testimony of the witnesses, Willey and Savage, which was offered for the purpose of proving particular acts of plaintiff in relation to the use of money in elections, prior to the publication of the libel set out in the complaint. Assuming that evidence of such acts was otherwise competent, it would not be admissible without showing, or offering to show, that the defendants had knowledge of such acts when they made the publication complained of, and there was no offer upon the part of the defendants to show such knowledge. (*Hatfield* v. *Lasher*, 81 N. Y. 246; *Morey* v. *Morning Journal Ass'n*, 123 N. Y. 207; 20 Am. St. Rep. 730; *Lothrop* v. *Adams*, 133 Mass. 471; 43 Am. Rep. 528; *Willover* v. *Hill*, 72 N. Y. 36.)

The defendants introduced evidence tending to show that the plaintiff's reputation was that of a person having money under his control for the purpose of corrupting voters, and the plaintiff offered evidence tending to show the contrary. Upon this state of the evidence, the defendants requested the court to give

the following instruction, which was refused: "In fixing the amount of damages it is proper that you take into consideration the reputation of the plaintiff at and prior to the time of the alleged publication, as to the point wherein he claims to be · damaged, and in case you find that plaintiff, prior to the publication, bore a bad reputation as to the point wherein he claims to be damaged, you may fix nominal damages only." The court did not err in refusing to thus instruct the jury. The defendants were entitled to an instruction, if they had requested it, that, in fixing the amount of damages, the jury might consider the previous character of the plaintiff as they might believe it to be from the evidence. But the jury, even if they found the character of the plaintiff to be bad, could not be restricted to nominal damages in their verdict, unless they believed that such damages would fully compensate the plaintiff for the wrong suffered by the publication of the matter alleged in the complaint, and that exemplary damages should not be given.

Judgment and order affirmed.

FITZGERALD, J., and McFARLAND, J., concurred.