[Civ. No. 58487. Second Dist., Div. Two. June 6, 1980.]

RANCHO LA COSTA, INC., et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY,
Respondent;
PENTHOUSE INTERNATIONAL, LTD., et al.,
Real Parties in Interest.

COUNSEL

Phillips, Nizer, Benjamin, Krim & Ballon, Buchalter, Nemer, Fields, Chrystie & Younger, Louis Nizer, John Dito and Michael J. Silverberg for Petitioners.

No appearance for Respondent.

Paul, Hastings, Janofsky & Walker, Grutman & Schafrann and Carl W. Shapiro for Real Parties in Interest.

OPINION

**BEACH, J.—**

NATURE OF PROCEEDINGS:

Plaintiffs in a libel action seek from this court a writ of mandate to compel the trial court to vacate its order of summary adjudication that

plaintiffs are public figures and that the defendants' publication was privileged under California Civil Code section 47, subdivision 3.* We grant the writ.

HISTORY:

The plaintiffs are five corporations and four individuals.[1] For simplicity, the corporate plaintiffs will be referred to collectively as the singular La Costa. The four individual plaintiffs, Merv Adelson, Irwin Molasky, Allard Roen and Mo Dalitz, were the organizers, creators and officers of the corporate plaintiffs.

In March 1975, real parties in interest (defendants) published an article on its face libelous of plaintiffs. The article accused the owners of the resort known as La Costa, including plaintiffs Adelson, Molasky, Roen and Dalitz, who were mentioned by name, of being mobsters, gangsters, members of organized crime and charged that the La Costa resort itself is an organized crime headquarters. The article sought to implicate plaintiffs in the "Watergate" scandal, nationwide bank failures, securities frauds totaling $50 *billion*, criminal misuse of Teamster monies and pension funds and swindle of many others including churches.

After the complaint for libel was filed in 1975, defendants also in 1975 filed their motion for summary judgment. The basis of defendants' motion was that: (1) plaintiffs are public figures and that defendants are therefore entitled to a privilege deriving from the First Amendment of the United States Constitution, and (2) defendants' publication is protected by the qualified privilege set forth in section 47(3) of the California Civil Code.

On November 19, 1975, Judge LeSage, who heard the motion, made his "Memorandum Opinion and Order" that "[t]he evidence is overwhelming that the corporate plaintiff, La Costa, and the individual plaintiffs are public figures, and that the La Costa story is a matter of general or public interest within the rules of *New York Times* v. *Sulli-*

---

*For brevity, hereafter referred to as Civil Code section 47(3) or section 47(3).

[1]Two plaintiffs Dalitz and Roen were "dismissed as plaintiffs" by a prior order. The basis thereof was that they were public figures who could not show malice by defendants. At the time of the renewal by defendants of the motion for summary judgment before Judge Dell, there appears to have been a motion for "reinstatement" of Roen as a plaintiff. This was denied. The issue is not before us on the present petition.

*van*, 376 U.S. 254 [11 L.Ed.2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412]; *Curtis Publishing Co.* v. *Butts*, 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975]; and *Rosenbloom* [v. *Metromedia*], 403 U.S. 29 [29 L.Ed. 2d 296, 91 S.Ct. 1811]; and the Court so finds." Further, the court, citing *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997], found that the individual plaintiffs "must be judged an inextricable part of the La Costa story, and thus public figures by the *Gertz* standard," apparently a reference to the "limited purpose public figure" doctrine set forth in *Gertz* v. *Robert Welch, Inc., supra*, 418 U.S. 323. However, it appears from the record before us that there was no "attorney order" prepared as directed within said memorandum opinion of November 19, 1975. Rather, it appears that the matter was reconsidered upon the court being advised of the case of *Time, Inc.* v. *Firestone* (1976) 424 U.S. 448 [47 L.Ed.2d 154, 96 S.Ct. 958], the opinion in which was rendered after the court's order of November 19, 1975. Accordingly, on April 5, 1976, Judge LeSage made his memorandum and notice of intended decision again making a careful and analytical review of the most significant and controlling cases, especially those of the Supreme Court of the United States. The court made its finding and order that the motions of defendants for summary judgment with respect to the plaintiffs Mo Dalitz and Allard Roen were granted on the ground that the plaintiffs Dalitz and Roen were public figures and had failed to show malice. With respect to all other plaintiffs, the motions for summary judgment were denied. The court ruled that triable issues arose under the rule of the *Firestone* case.

In making its notice of intended ruling of April 5, 1976, the court stated that it had considered "in complete detail all the briefs, motions, pleadings, exhibits and evidence in this case." On June 25, 1976, the court declared that there were triable issues of fact with respect to whether or not all of the plaintiffs (except Mr. Dalitz and Mr. Roen) are public figures.

After the order of June 25, 1976, defendants petitioned the Court of Appeal for writ of mandate, which was denied. Hearing was denied by the California Supreme Court and certiorari denied by the United States Supreme Court. In July 1977, defendants again made a motion for summary judgment, this time expressly based upon the asserted privilege under Civil Code section 47(3). The defendants urged that this privilege was not ruled upon and formed no part of the basis of the trial court's earlier rulings of April 5, 1976, and its order of June 25, 1976,

described earlier. A different judge, Foster, by whom this second motion was heard, concluded that the issue thus presented to him was a legal one, to wit, whether as a matter of law section 47(3) controlled. Judge Foster deemed it inappropriate to review the presumed determination of the prior judges on this issue. Accordingly, Judge Foster denied the defendants' motion.

About a year later on April 10, 1978, defendants filed another "motion for determination of issues without substantial controversy." The motion requested the same relief and was assigned to Judge Charles H. Phillips for hearing. After preliminary argument and an informal expression by the judge that the question of whether plaintiffs are public figures had been decided earlier, the motion was withdrawn.

Thereafter, the matter was assigned to Judge Dell for all purposes including trial. The matter having thus been assigned, defendants renewed their motion for summary judgment that plaintiffs were public figures. In hearing the motion Judge Dell apparently considered the matter as requiring factual as well as legal determinations. As the trier of fact, it was not inappropriate for Judge Dell to have heard the renewed motion. It was in effect a request that certain issues be bifurcated and tried first.[2] These issues, if resolved favorably to defendants, would be dispositive of the case and eliminate the need for further lengthy trial on complex, factual questions. However, the determination, of course, required a trier of fact to hear and weigh the evidence relative to the question of whether or not plaintiffs' conduct made them public figures.

After hearing, the court on November 2, 1979, made the following ruling: "The Court denies the motion of Allard Roen for an order reviewing his dismissal as a plaintiff and restoring him as a plaintiff. The court's ruling is based upon both procedural and jurisdictional grounds and further upon the merits of the application.

"The Court grants the motions of defendants, Penthouse International, Ltd., Robert Guccione, Jeff Gerth and Lowell Bergman for an order adjudicating the following legal issues with respect to the Complaint in

[2]However, at the time defendants asserted the motion required resolution of only a *legal* issue. If this be so, it is hard to see how it could have been properly renewed except upon a claim of new *undisputed evidence* to support a different ruling. (See Code Civ. Proc., § 1008.)

this action, as follows: "1. Section 47(3) of the California Civil Code affords a qualified privilege to media publications concerning matters of legitimate public interest.

"2. Defendants' publication of the Article entitled 'La Costa['] concerns matters of legitimate public interest.

"3. Defendants' publication of said article is protected by a qualified privilege set forth in Section 47(3) of the California Civil Code.

"4. A corporation can be a public figure under the First Amendment to the United States Constitution.

"5. Plaintiff Rancho La Costa, Inc., has been a subject of legitimate public controversy.

"6. Plaintiff Rancho La Costa, Inc., is a public figure under the First Amendment to the United States Constitution.

"7. Plaintiff Merv Adelson, by virtue of his voluntary involvement as an officer, founder and defender of Rancho La Costa, Inc., is a public figure with respect to publications concerning the controversy surrounding La Costa.

"8. Plaintiff Irwin Molasky, by virtue of his voluntary involvement as an officer, founder and defender of Rancho La Costa, Inc., is a public figure with respect to publications concerning the controversy surrounding La Costa."

After the decision of November 2, 1979, plaintiffs (petitioners) applied to this court for writ of mandate directing the superior court to vacate its decision and order of November 2, 1979, and to enter an order denying the motion of defendants for partial summary judgment. We denied the previous petition[3] but directed the attention of the trial court to the California Supreme Court decision in *Vegod Corp.* v. *American Broadcasting Companies, Inc.* (1979) 25 Cal.3d 763 [160 Cal.Rptr. 97, 603 P.2d 14]. Petitioners thereupon applied to the superior court to reconsider its "public figure ruling." The superior court ruled on January 18, 1980, that it would not change its prior decision of November 2, 1979.

---

[3]*Rancho La Costa* v. *Superior Court*, 2d Civ. 57880.

That portion of the order denying plaintiff Roen reinstatement is not before us in this petition for writ of mandate.

DISCUSSION:

█ For the reasons set forth below, we conclude that the trial court erred and we must grant a peremptory writ.

The issue before us is simply whether either the (1) "public figure" privilege under the federal Constitution, or (2) conditional privilege of Civil Code section 47(3) is available to defendants as a defense as a matter of law to the action for libel. Because our determination concerning the state statutory privilege (Civ. Code, § 47(3)) will be better understood in light of the discussion of the inapplicability of the constitutional privilege respecting public figures, we will discuss the constitutional privilege first.[4]

## I

## THE PUBLIC FIGURE PRIVILEGE

In *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254 [11 L.Ed. 2d 686, 84 S.Ct. 710, 95 A.L.R.2d 1412], the United States Supreme Court expressed the rule that "public officials" may not prevail in an action for libel unless they can prove malice. That malice was described as present when the defendant publishes a statement with knowledge that it is false or with reckless disregard of whether it is false or not. (*Id.* at pp. 279-280 [11 L.Ed.2d at pp. 706-707].) This obviously imposes a harsh burden upon plaintiffs. In the case of one suing a newspaper, a radio station, a television network or other disseminators of repeated information, it creates an exceptionally difficult burden to overcome. In the companion cases of *Curtis Publishing Co.* v. *Butts* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975] and *Associated Press* v. *Walker* (1967) 388 U.S. 130 [18 L.Ed.2d 1094, 87 S.Ct. 1975], the court extended the rule of *New York Times Co.* v. *Sullivan, supra,* to apply to libel suits brought by "public figures." However, "public figure" was not then and there completely and totally defined

---

[4]We are mindful that generally where possible dispositive issues of statutory and local law should first be treated before reaching constitutional issues. (*Wolston* v. *Reader's Digest Assn. Inc.* (1979) 443 U.S. 157 [61 L.Ed.2d 450, 99 S.Ct. 2701].) But here we discuss both aspects.

█

for all times. Further definition and refinement developed through subsequent United States Supreme Court decisions. Thus in *Rosenbloom* v. *Metromedia* (1971) 403 U.S. 29 [29 L.Ed.2d 296, 91 S.Ct. 1811], the court affirmed a further extension of the *New York Times Co.* v. *Sullivan* privilege to a libel suit by a private individual against a licensed radio station for defamatory falsehood in a newscast relating to his "involvement in an event of *public or general concern.*" Under this test or definition the apparent facts of the present case would support the November 2, 1979, decision of the superior court. However, this definition from *Rosenbloom* was subsequently abandoned in favor of a stricter test of "public figure." We do not say nor do we imply that the trial judge was unaware or ignored the subsequent and relatively recent cases of *Time, Inc.* v. *Firestone, Gertz* v. *Robert Welch, Inc., Wolston* v. *Reader's Digest Assn., Inc.* or *Vegod Corp.* v. *American Broadcasting Companies, Inc.* To the contrary, the court appears to have been well informed and to have made a careful and thoughtful analysis. But we conclude that the evidence before the court does not support a decision that the plaintiffs are public figures even for the "limited purpose" definition established in *Gertz* v. *Robert Welch, Inc.* Rather, the evidence would tend to support only a definition of "public figure" as expressed in *Rosenbloom* v. *Metromedia.*

The *Rosenbloom* extension of the *New York Times Co.* v. *Sullivan* privilege to defamation of private individuals "involved in" matters of "public or general concern" was expressly rejected and overruled by the Supreme Court in *Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323. In *Gertz,* the court recognized two possible classifications of public figures, i.e. (1) the all-purpose public figure and (2) the limited-purpose public figure. As to the first type, the court explained that there might be in some instances certain persons who "occupy positions of such persuasive power and influence that they are deemed public figures for all purposes." (*Id.* at ·p. 345 [41 L.Ed.2d at p. 808].) Quoting from *Curtis Publishing Co.* v. *Butts, supra,* the *Gertz* court indicated that such individuals are those who "'by reason of their fame, shape events in areas of concern to society at large.'" (*Gertz* v. *Robert Welch, Inc., supra,* 418 U.S. 323, 337 [41 L.Ed.2d 789, 803].) In this respect the court, however, cautioned: "[a]bsent clear evidence of general fame or notoriety in the community, and pervasive involvement in the affairs of society, an individual should not be deemed a public personality for all aspects of his life." (*Id.* at p. 352 [41 L.Ed.2d at p. 812].) The second group, the limited-purpose public figures, was defined as those who "have thrust themselves to the forefront of particular public controversies in order to

influence the resolution of the issues involved." (*Id.* at p. 345 [41 L.Ed. 2d at p. 808].) Both groups "...invite attention and comment." (*Ibid.*) But, the court said, "No such assumption is justified with respect to a private individual. He has not accepted public office or assumed an 'influential role in ordering society.'" (*Ibid.*)

It is significant that the *Gertz* court described other interests to be considered. It said: "We begin with the common ground. Under the First Amendment there is no such thing as a false idea...[b]ut there is no constitutional value in false statements of fact. Neither the intentional lie nor the careless error materially advances society's interest in 'uninhibited, robust, and wide-open' debate on public issues. [Citation.] They belong to that category of utterances which 'are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' [Citation.]" (418 U.S. pp. 339-340 [41 L.Ed.2d p. 805].)

The court further held: "The need to avoid self-censorship by the news media is...not the only societal value at issue....

"The legitimate state interest underlying the law of libel is the compensation of individuals for the harm inflicted on them by defamatory falsehood. We would not lightly require the State to abandon this purpose, for, as Mr. Justice Stewart has reminded us, the individual's right to the protection of his own good name 'reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system.' [Citation.]" (418 U.S. at p. 341 [41 L.Ed.2d at p. 806].) More significantly, in California this right of privacy is not merely implied but is expressly set forth in article I, section 1 of the state Constitution.

In *Gertz*, the plaintiff, an attorney, by his own admission had an extensive record of public activity involving thousands of writings and public appearances and involvement in matters affected with public interest. There was evidence that he had written thousands of articles and reviews for countless publications. He had written for encyclopedias and other books and pamphlets and plays. He had written legal articles; he

had written on politics, history, political science and journalism as well as many other fields. He had been interviewed during the course of 20 or 30 years by numerous radio and television stations in the State of Illinois and had made broadcasts on radio and television in many states across the nation. Most of the programs dealt with cases in which the plaintiff had been involved. He was a prominent attorney in Chicago, having represented clients who sometimes commanded a wide following in the press and media. And he had long been involved in civic affairs. In the libel action, defendant there asserted the public figure privilege. Yet notwithstanding the wide range of plaintiff's activity, his voluntary involvement in matters of public importance, and the scope of his activity,[5] the high court said that he was neither an all-purpose nor a limited-purpose public figure.

In *Time, Inc.* v. *Firestone, supra,* 424 U.S. 448, the court held that Mrs. Firestone, although a socialite of Palm Beach and the wife of a member of a famous family, was not and did not become a public figure, even though her divorce proceedings had become publicized and well known. Plaintiff herself caused some of the publicity by the calling of a series of press conferences. The 17-month trial attracted national attention and elicited 88 articles in the Miami and Palm Beach newspapers. Even so, the United States Supreme Court held that the relevant inquiry should be confined to whether a plaintiff is a public officer or a public figure who might be assumed to voluntarily expose himself to increased risk of injury from a defamatory falsehood. The court explained: "Respondent did not assume any role of especial prominence in the affairs of society, other than perhaps Palm Beach society, and she did not thrust herself to the forefront of any particular public controversy in order to influence the resolution of the issues involved in it." (*Id.* at pp. 453-454 [47 L.Ed.2d at pp. 162-163].)

In *Wolston* v. *Reader's Digest Assn., Inc.* (1979) 443 U.S. 157 [61 L.Ed.2d 450, 99 S.Ct. 2701], and its companion case, *Hutchinson* v. *Proxmire* (1979) 443 U.S. 111 [61 L.Ed.2d 411, 99 S.Ct. 2675], the definition of public figure was further narrowed. In *Wolston*, plaintiff, the nephew of convicted spies Myra and Jack Soble, had been the subject of "a major investigation into the activities of Soviet intelligence

---

[5]Although the recital of the facts in 418 U.S. 323 [41 L.Ed.2d 789, 94 S.Ct. 2997] does not contain all of the evidence which we recite, we are informed by counsel that the above described background of Gertz was the undisputed evidence from Gertz' own testimony and in the record before the United States Supreme Court.

agents in the United States," (443 U.S. at p. 161 [61 L.Ed.2d at p. 456]) and had failed to respond to a grand jury subpoena resulting in an order to show cause why he should not be punished for contempt. In his libel action arising out of the Reader's Digest article about him, the court held that he was not a public figure. The court recognized that he had received extensive publicity at the time of the 1958 contempt citation, yet despite that publicity and the obvious importance of the issue of Soviet espionage the United States Supreme Court said that he was not a public figure either at the time of the publicity, or at the time of the publication, because he did not voluntarily "engage the attention of the public in an attempt to influence the resolution of the issues involved."[6]

The language of the court defines the further limitations thus: "A private individual is not automatically transformed into a public figure just by becoming involved in or associated with a matter that attracts public attention. To accept such reasoning would in effect re-establish the doctrine advanced by the plurality opinion in *Rosenbloom* v. *Metromedia, Inc.*, 403 U.S. 29, 44 (1971), which concluded that the *New York Times* standard should extend to defamatory falsehoods relating to private persons if the statements involved matters of public or general concern. We repudiated this proposition in *Gertz* and in *Firestone*, however, and we reject it again today." (*Wolston* v. *Reader's Digest Assn., Inc., supra*, 443 U.S. 157, 167 [61 L.Ed.2d 450, 460].)

The following language is also apposite: "It is difficult to determine with precision the 'public controversy' into which petitioner is alleged to have thrust himself. Certainly, there was no public controversy or debate in 1958 about the desirability of permitting Soviet espionage in the United States; all responsible United States citizens understandably were and are opposed to it. Respondents urge, and the Court of Appeals apparently agreed, that the public controversy involved the propriety of the actions of law enforcement officials in investigating and prosecuting suspected Soviet agents.... We may accept, *arguendo*, respondents'

---

[6]Even if one of *petitioners here might be* proven to have been a public figure or a limited public figure by reason of some involvement with or association with one convicted of a criminal offense, passage of time may well erase that status and reduce such a plaintiff to the status of private individual. (*Wolston* v. *Reader's Digest Assn., Inc.* (1979) 443 U.S. 157, 166, fn. 7 [61 L.Ed.2d 450, 459, 99 S.Ct. 2701]; see conc. opn. Blackmun, p. 169 [61 L.Ed.2d p. 461] and note at p. 170 [61 L.Ed.2d at p. 462].) As in *Wolston*, we need not rely upon this passage-of-time argument. The evidence at bench is insufficient to establish plaintiffs as public figures for the purpose of any privilege.

■

characterization of the 'public controversy' involved in this case, for it is clear that petitioner fails to meet the other criteria established in *Gertz* for public-figure status." (*Id.* at p. 166, fn. 8 [61 L.Ed.2d at p. 459].)

At bench there is no public controversy or debate over the "desirability" of "organized crime." There truly never has been. All conscientious and responsible citizens are opposed to it. There was no "controversy" over La Costa itself. At most it was a matter of limited press interest. The creation of a large resort-spa and attendant facilities created no "public controversy." But, even if La Costa were deemed arguendo a matter of public controversy, that fact alone would not and does not make petitioners public figures. In *Hutchinson* v. *Proxmire, supra,* 443 U.S. 111, the court similarly held that plaintiff there, a prominent scientist and administrator who had broad "access to the media," was likewise not a public figure because: "Hutchinson did not thrust himself or his views into public controversy to influence others. Respondents have not identified such a particular controversy; at most, they point to concern about general public expenditures." (*Id.* at p. 135 [61 L.Ed.2d at p. 431].)

California has recently recognized the limits placed upon defamatory speech by the United States Supreme Court cases discussed above. In *Franklin* v. *Benevolent etc. Order of Elks* (1979) 97 Cal.App.3d 915 [159 Cal.Rptr. 131], defendant Elks association was sued by plaintiff school teacher. She had selected parts of a book which was a "pastiche of underground writings concerning revolution, sex and drugs, vividly illustrated and replete with vulgar language," (*id.* at p. 919) for use in her high school classroom. The defendant organization wrote and published an editorial in its own magazine strongly criticizing the book and its use as instructional material. The editorial reported that the teacher had been dismissed from another school system and opined that she was not the sort of teacher that anyone wanted teaching in our school system. In the defense of the ensuing libel action, the defendants moved for summary judgment based on the contention that the teacher could not establish as an essential element of her case i.e., that the alleged libels were published with actual malice; that she as a public official and public figure was required to establish such malice. The court summarily rejected the assertion that a school teacher was a public official. As to the question of whether the teacher had been a public figure, the court said: "In our view the definition of 'public figure' which has evolved from *Butts* through *Gertz, Firestone* and *Wolston* incorporates as an element a requirement that the libel plaintiff must have voluntar-

ily and actively sought, in connection with any given matter of public interest, to *influence* the resolution of the issues involved. To us it seems clear that only by such voluntary and active participation could an individual be said to have 'relinquished...his interest in the protection of his own name.'" (*Id.* at p. 929; italics in original.) Thus the teacher was held not to be a public figure.

The recent case of *Weingarten* v. *Block* (1980) 102 Cal.App.3d 129 [162 Cal.Rptr. 701], affords a comparison of one who is truly a public official or public figure and who has thrown himself into the vortex of the particular controversy. The court there correctly recognized that the attorney for a city or for a public district is a *public* figure. But, moreover, the court explained that the employee's position must be one which would invite public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy. The court there noted the activities of the plaintiff which were set forth in the findings of the court. He was active as a lawyer, an officer of a political party, a candidate for the state legislature, the leader of a recall movement, and a prolific real estate dealer. He had voluntarily appeared and spoken openly concerning matters of city and public affairs which related to and affected his property dealings. He had not only been city attorney but was also attorney for the redevelopment agency. As such, plaintiff had substantial control over the conduct of governmental affairs of the city. After his discharge as city attorney and the recall of some of the city council's members who had discharged him, the public had an independent interest in anything that might touch on his fitness for that office and for his continued services to the redevelopment agency.

Considering next the corporate or public nature of some of the plaintiffs, that fact affords defendants no greater privilege of defamation. (*Vegod Corp.* v. *American Broadcasting Companies, Inc., supra*, 25 Cal.3d 763.) The court there said that for the purposes of applying the First Amendment privilege to defamation claims, there is no difference between corporations and individuals. Corporations may equally be public figures but are equally entitled to the same protections as private individuals with reference to the public-figure aspect and the issue of malice. Recognizing and relying primarily upon the persuasions and holdings of *Firestone* and *Gertz*, our Supreme Court said in *Vegod*: "Defendants argue that the demise and closing out sale of the City of Paris were matters of public controversy because it was a 'landmark store.' Even assuming the venerable store's planned destruction created

a public controversy, those conducting the subsequent close-out sale cannot be said to have thrown themselves into the vortex of that controversy. It does not appear that plaintiffs urged City of Paris publicly or otherwise to terminate business or to destroy the 'landmark.' Merely doing business with parties to a public controversy does not elevate one to public figure status.

"Defendants also urge that by selling goods to the public and by advertising the sale plaintiffs became public figures. In *Gertz* the court in concluding that he was not a public figure pointed out that Mr. Gertz had never discussed the civil or criminal litigation with the press. In *Firestone* the court pointed out that Mrs. Firestone did not seek publicity on the propriety of her marital conduct.

"While availability of goods for sale and their quality are matters of public interest, this is not the test. The public interest test was expressly rejected in *Gertz* (418 U.S. at p. 346 [41 L.Ed.2d at p. 809]), and in *Firestone* (424 U.S. at pp. 455-456 [47 L.Ed.2d at pp. 163-164]), in favor of the public controversy test. (See also *Hutchinson* v. *Proxmire* (1979) 443 U.S. 111 [61 L.Ed.2d 411, 99 S.Ct. 2675].)

"Criticism of commercial conduct does not deserve the special protection of the actual malice test. Balancing one individual's limited First Amendment interest against another's reputation interest (*Herbert* v. *Lando* (1979) 441 U.S. 153, 169, [60 L.Ed.2d 115, 129, 99 S.Ct. 1635]), we conclude that a person in the business world advertising his wares does not necessarily become part of an existing public controversy. It follows those assuming the role of business practice critic do not acquire the First Amendment privilege to denigrate such entrepreneur." [Fn. omitted.] (*Vegod Corp.* v. *American Broadcasting Companies, Inc., supra*, 25 Cal.3d 763, 769-770.)

It is apparent from *Vegod* that merely because a corporation sells services to the public as does La Costa, and merely because it employs and has access to the media to advertise its services (as *Vegod* had the access to advertise its wares) does not mean that such ability gives the corporation the status of one with greater power of persuasion on public issues, controversial or not, or all-pervasive influence. Thus it is apparent that neither the "public interest" test rejected in *Gertz* nor the voluntarily-thrusting-into-public-controversy test present in *Weingarten* v. *Block* applies simply because of the availability of advertising.

We note that defendants both in their oral presentation and in their briefs stressed the fact that La Costa had access "to the media" for a great and costly advertising campaign. The holding of *Vegod* sufficiently answers that advertising is not thrusting oneself into the vortex of a controversy. Similarly the "great access" to "the media"—also urged by defendants as significant—is not the same thing as having or seeking to have persuasive or pervasive influence on the *outcome* of controversial issues.

Assessing the status of petitioners at bench in the light of the above cases from the United States Supreme Court, and especially comparing the protected "private individual" status accorded the several plaintiffs in *Gertz, Firestone, Wolston* and *Hutchinson* and further considering the tremendous amount of prelibel publicity given to those respective individuals, it appears to us from the record that the evidence presented to the trial court concerning the petitioners here falls far short of the quality and quantity required. The record fails to demonstrate that level of clarity and substance of evidence required to prove and establish the petitioners as public figures.

## II

### THE INADEQUACY OF SHOE BOX EVIDENCE

In proving that the plaintiff in a libel action is a public figure, it is not enough simply to present evidence of much publicity. The quantity of such evidence might be a shoe boxful or a trunkful of newspaper and magazine clippings. Admittedly, in this case the amount of evidence presented to the trial court in support of the motion was extremely voluminous. Not all of it was physically present before Judge Dell when he heard and considered the motion. It originally consisted of several boxes of books, magazines, newspaper clippings, reports, and later had added to it exhibits to depositions. A large amount was presented to Judge LeSage in 1975. Some of it was lost. There may have been copies of the lost material. Copies of the lost material together with other documents were summarized by Jewel Bjork, cocounsel for defendants. She presented to Judge Dell an affidavit summarizing the nature of the hundreds of documents and papers constituting the exhibits. We have no question concerning the truthfulness of Ms. Bjork's affidavit nor the truthful description of the contents of the original documents. In her affidavit Ms. Bjork classifies the mass of documentary evidence gathered

and separated into seven files as exhibits. She explains that the several exhibits deal with the following topics: "(a)   media access by the plaintiffs (Exhibit 1);

"(b)   plaintiffs' general fame or notoriety in the community (Exhibit 2);

"(c)   plaintiffs' purposeful involvement in the vortex of the La Costa story (Exhibit 3);

"(d)   the genesis and history of the controversy about La Costa (Exhibit 4);

"(e)   the continuing public interest in the controversy and the plaintiffs (Exhibit 5);

"(f)   the public figure status of Dalitz and Roen, as shown earlier in this action via the Gelb affidavits of 1975 (Exhibit 6);

"(g)   the identification of Dalitz and Molasky as figures involved with organized crime by the Attorney General of the State of California (Exhibit 7); and

"(h)   the intense public interest and concern with crime, Teamsters Pension Fund loans, corrupt business and politics (Exhibit 8)."

We have not personally examined this mass of documentary evidence. However, giving full credence to Ms. Bjork's statement as to what the seven groups contain, it is clear to us that the evidence is legally insufficient. Ms. Bjork's characterization of much of the material as more fully described in her affidavit is conclusionary; on the specific question of the status or character of the plaintiffs, as "mobsters," "gangsters," "crooks," and "associates" of crooks and mobsters, etc. the "evidentiary" material is "99 and 44/100's%" pure hearsay and itself conclusionary. Most of the purported evidence is third- and fourth-hand hearsay. Most of the documents discussed in Ms. Bjork's affidavit refer to other documents or sources of hearsay such as prior "reports" by newspapers, magazines, television "documentaries" and the like. There is no showing that there was presented to the trial court either at the 1975, 1977 or 1978 hearings or to Judge Dell at the 1979 hearing, any *primary* source of information relative to the specific conduct of any particular plaintiff

eyewitnessed by a percipient witness and upon which defendants can pin the tag of public figure on such plaintiff. There is no primary non-hearsay evidence of criminality of the remaining corporate or individual plaintiffs. Even accepting that Dalitz, not a party to this petition, was a convicted criminal, mere association or working with others accused or convicted of crime is not enough under *Gertz* and *Wolston, supra.*

Even if the material is a mountain of clippings, it is no better than that in *Franklin* v. *Benevolent etc. Order of Elks, supra*, 97 Cal.App.3d 915, 930, where the court said: "Respondents tendered in support of their motion for summary judgment, in addition to materials plainly directed to the actual-malice issue, a voluminous collection of clippings from newspapers and from a newsmagazine, relating both to the San Rafael textbook controversy and to an episode several years earlier, in Paradise, California, in which appellant had experienced a similar confrontation over her teaching methods with the local American Legion post. It is elementary that affidavits in support of a motion for summary judgment shall contain, and may be considered only to the extent that they contain, admissible evidence (Code Civ. Proc., § 437c; 4 Witkin, Cal. Procedure (2d ed. 1971) Proceedings Without Trial, §§ 180-187, pp. 2832-2837). It is clear that, by virtue of the hearsay rule (Evid. Code, § 1200 et seq.), respondents' collection of clippings was not admissible evidence of the facts stated therein, but could be competent evidence only of the fact that appellant had received a considerable amount of publicity." Similarly, we here reject the proposition that public figure status can be established by evidence of much publicity which, in turn, is primarily or basically a voluminous amount of newspaper and magazine articles, the "shoe-boxful" method of proof.

That the plaintiffs' commercial enterprises, La Costa Resorts and the other corporate activities, advertised their services for purposes of promoting business nationwide, does not add to or change the "shoe box" evidence here. (*Vegod Corp.* v. *American Broadcasting Companies, Inc., supra*, 25 Cal.3d 763.) Moreover, absent the requisite elements of public figure status, as we have discussed them above, no amount of publicity can involuntarily convert the purely private individual into a public figure. Lacking at bench is direct evidence of facts showing that plaintiffs intentionally and voluntarily sought publicity or entered into a particular controversy to affect its outcome. Defendants have a mountain of material. But they do not point to any items of evidence showing (1) what particular controversy existed, (2) the particular acts as to

how, where and when plaintiffs entered therein, (3) that plaintiffs did so intentionally, and (4) that they intended to affect its outcome. In sum, there is an absence of firsthand evidence of plaintiffs' *conduct* making them public figures. We do not accept defendants' contention that publicity per se—light or heavy—creates a public figure. It is clear to this court that it has not been established as a matter of law at this stage of the proceedings that plaintiffs are public figures. There is here no agreement as to the ruling on the motion by the trial court.[7]

## III

### The Privilege Under Civil Code Section 47(3)

■ Apart from the claim of privilege concerning public figures which we have discussed above, defendants claim that their publication was privileged under Civil Code section 47(3). We reject the contention. The state conditional privilege of section 47(3) does not apply to a publication by a magazine or newspaper merely because it relates to a matter which may have general public interest. (*Newby* v. *Times-Mirror Co.* (1920) 46 Cal.App.110 [188 P. 1008]; *Gilman* v. *McClatchy* (1896) 111 Cal. 606 [44 P. 241].)

Civil Code section 47(3) extends a general privilege to a communication made "without malice to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such relation to the person interested as to afford a reasonable ground for supposing the motive for the communication innocent, or (3) who is requested by the person interested to give the information."

The word "interested" as used in the statute refers to a more direct and immediate concern. That concern is something other than mere

---

[7]The precise nature of the motion before the trial court and thus the exact extent of the task imposed upon the trial judge is somewhat uncertain. Defendants assert in their briefs and exhibits before us that the motion before Judge Dell was not a motion *in limine* involving a determination of factual questions. If not, what was it? Defendants assert that the motion was solely for the determination of specific *legal* issues. As indicated earlier, we have some difficulty in recognizing this as proper under Code of Civil Procedure section 1008. Whatever the procedural posture, whether the motion was a traditional motion for summary judgment or simply for adjudication of a bifurcated issue, our discussion demonstrates that because of the existence of factual questions yet to be determined, this procedure for a form of summary adjudication of part of the case, while perhaps not totally inappropriate, is of questionable value in a case such as this, where the operative facts are neither all established nor agreed to. (*Hutchinson* v. *Proxmire* (1979) 443 U.S. 111, 120, fn. 9 [61 L.Ed.2d 411, 422, 99 S.Ct. 2675].)

general or idle curiosity of the general readership of newspapers and magazines. One authority explains the statutory interest as follows: (1) The "interest" applies to a defendant who "is protecting his own pecuniary or proprietary interest." (2) The required "relation" between the parties to the communication is a contractual, business or similar relationship, such as "between partners, corporate officers and members of incorporated associations," or between "union members [and] union officers." (3) The "request" referred to must have been in the course of a business or professional relationship. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, §§ 306-309, pp. 2577-2580.)

While this definition may not be exclusive, it is clear that the case at bench does not qualify for application of the conditional privilege. The strictly limited statutory qualified privilege is inapplicable to a defamatory article published at large to a vast audience in a national magazine.

In *Gilman* v. *McClatchy, supra,* 111 Cal. 606, where the Supreme Court of California unequivocally denied the applicability of the section 47(3) privilege to a false newspaper report that the plaintiff had committed a crime, the court said: "In this case appellant asks for such an extension of the law as would give immunity to publishers of libels, provided express malice in the publication be absent. In other words, his contention resolves itself to this, that a newspaper is a purveyor of news; the people have the right to read the news; any story gleaned by a reporter as this was gleaned, and published in the ordinary course of newspaper business without personal malevolence against the victim of the tale, should be held privileged. [¶] In support of this contention there is neither authority, law, nor justice." (*Id.* at pp. 613-614.)

In *Gilman,* the court recognized a privilege under section 47(3) to comment fairly on the conduct of "public officials" but it refused (much like the Supreme Court in *Gertz* v. *Welch*) to extend the qualified privilege to all matters of "public interest," on the ground that such an extension "would...put upon the people a greater evil than that which the constitution sought to prevent." The court concurred with the case of *McAllister* v. *Detroit Free Press Co.* (1889) 76 Mich. 338 [43 N.W. 431, 15 Am. St. Rep. 318], quoting the language therein, as follows: "'No newspaper has any right to trifle with the reputation of any citizen, or by carelessness or recklessness to injure his good name and fame, or business.... And no sophistry of reasoning, and no excuse of the demand of the public for news, or of the peculiarity and magnitude

of newspaper work, can avail to alter the law, except, perhaps, by positive statute, which is doubtful, so as to leave a party thus injured without any recompense for a wrong which can even now, as the law stands, never be adequately compensated to one who loves his reputation better than money.'" (*Id.* at p. 615.)

That principle has been reaffirmed in more recent cases, e.g., *Peoples v. Tautfest* (1969) 274 Cal.App.2d 630, 636-637 [79 Cal.Rptr. 478], where the court held: "We conclude that the privilege provided in subdivision 3 of section 47 is not applicable to the case at bench.... The accusations were made to persons sought out by appellants and were unsolicited. They did not relate directly to the conduct of a public officer or employee or of a candidate for public office. [Citations.]"

So too, in *Newby v. Times-Mirror Co., supra,* 46 Cal.App. 110, where an attorney sued a newspaper for libel, and the newspaper alleged a privilege under section 47(3) of the Civil Code, the court held that an article is not privileged "simply because it relates to a subject of public interest." To the same effect, see *Newby v. Times-Mirror Co.* (1916) 173 Cal. 387 [160 P. 233]; *Edwards v. Publishing Soc.* (1893) 99 Cal. 431 [34 P. 128]. In *Edwards* it was emphatically held that: "A newspaper proprietor is not privileged as such in the dissemination of the news, but is liable for what he publishes in the same manner as any other individual. (*McAllister v. Detroit Free Press Co.,* 76 Mich. 338; 15 Am. St. Rep. 318)." (*Id.* at p. 439.)

In *Earl v. Times-Mirror Co.* (1921) 185 Cal. 165 [196 P. 57], the defendants again invoked section 47. The Supreme Court rejected the claimed application of the conditional privilege saying: "That the publication of a newspaper by the plaintiff, as a matter of law affects either the liability of the defendants to respond in damages, or the right of the plaintiff to recover for a publication which would be considered libelous as to any other person, is a proposition that cannot be successfully maintained. The decision in the case of *Newby v. Times-Mirror Co.,* 173 Cal. 387, [Ann. Cas. 1917E, 186, 160 Pac. 233], supports this conclusion." (*Id.* at p. 197.)

The authorities cited by defendants in the memoranda to the trial court and before us as part of the exhibits are distinguishable. A number of those cases which applied the section 47(3) privilege to defamatory comments related to public officials. (E.g., *Snively v. Record Publishing Co.* (1921) 185 Cal. 565 [198 P. 1]; *Harris v. Curtis*

*Publishing Co.* (1942) 49 Cal.App.2d 340 [121 P.2d 761]; *Everett* v. *California Teachers Assn.* (1962) 208 Cal.App.2d 291 [25 Cal.Rptr. 120].) In other cases, the publication was limited to a local or a special interest group and related to matters of special concern. (*Maidman* v. *Jewish Publications, Inc.* (1960) 54 Cal.2d 643 [7 Cal.Rptr. 617, 355 P.2d 265, 87 A.L.R.2d 439]; *Brewer* v. *Second Baptist Church* (1948) 32 Cal.2d 791 [197 P.2d 713]; *Toney* v. *State of California* (1976) 54 Cal.App.3d 779 [126 Cal.Rptr. 869]; *Williams* v. *Daily Review, Inc.* (1965) 236 Cal.App.2d 405 [46 Cal.Rptr. 135]; *Glenn* v. *Gibson* (1946) 75 Cal.App.2d 649 [171 P.2d 118]; *Heuer* v. *Kee* (1936) 15 Cal.App.2d 710 [59 P.2d 1063].)

Plaintiffs as private individuals are entitled to the protection of their right of privacy. That right is entitled to redress when violated. Under the mandate of the recent federal Supreme Court rulings, the right of privacy is paramount to the right of free speech when in the exercise of free speech a defendant violates another's privacy by uttering a defamatory lie about him. The right of free speech guaranteed by the state and federal Constitutions does not permit violation of the right of privacy. It most surely follows that the privilege created by Civil Code section 47(3), a statute, and thus a law of lesser organic force, cannot be expanded to permit violation of that same right of privacy. Whatever privilege is accorded defendants under Civil Code section 47(3), it must yield to the plaintiffs' constitutional rights of privacy.

We need not extend the discussion of the inapplicability of section 47(3) relative to the subject matter of the publication at bench, and who was interested therein, who was entitled to receive and who was entitled to disseminate it. Such discussion is made unnecessary because the only basis upon which defendants seek the benefit of the statute is by saying that the public at large, and hence that part thereof which constitutes its readership, is interested generally in the fight against organized crime. There being no specific evidence of any particular or specific subject matter of communication, no recital of the inadequacy of the evidence on the application of the section is necessary.

Defendants contend that the application of section 47(3) is solely a matter of law, and its application is apparent from the plaintiffs' own complaint. We have accepted defendants' premise in this present discussion relative to Civil Code section 47(3). The complaint discloses that the plaintiffs organized corporations and are officers and directors thereof. The corporations operate hotels, resorts, spas and attendant

services. These services are offered to the public. Defendants publish a magazine with a circulation in excess of five million. The defamatory article appeared in defendants' magazine. This is no more than the claim of carte blanche application of the privilege of section 47(3) to any newspaper or magazine of national or general readership, a proposition which, we explained above, is not the law.

In summary, we conclude that there remain factual questions to be tried. Either party is entitled to a trial by jury on these issues of fact, if a jury has been properly requested. The trial court can prepare instructions to the jury as to what facts it must determine are present and which are necessary to constitute libel, and what facts make a person a public figure and what is malice. The plaintiffs are entitled to recover if they can prove (1) the publication of a libelous statement, and (2) damages arising therefrom. Defendants are still entitled to prove if they can the *fact* that plaintiffs are public figures. They have the burden of proof thereon. They may seek to prove such fact by the introduction of competent evidence on that issue. That evidence may include evidence that by their voluntary conduct, plaintiffs intentionally or unwittingly removed themselves from the status of private persons, or willingly exposed themselves and relinquished their rights of privacy. If the defendants so prove that plaintiffs are public figures, then plaintiffs in order to recover must, in addition to proving the publication of a libelous statement, prove that the publication was made with malice as that term is defined under California law and the damages therefrom.

It is ordered that a writ issue directing the superior court to vacate its order of November 2, 1979, and to make and enter a new and different order consistent with the opinions expressed herein.

Roth, P. J., and Fleming, J., concurred.

A petition for a rehearing was denied June 26, 1980, and the petition of real parties in interest for a hearing by the Supreme Court was denied August 28, 1980. Tobriner, J., was of the opinion that the petition should be granted.